IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE FASTENERS ANTITRUST LITIGATION | : : : : | MDL Docket No. 1912 |
| THIS DOCUMENT RELATES TO: ALL CLAIMS UNDER UNITED STATES LAW | : : : : : | |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Fishman & Tobin, Inc., Greco Apparel, Inc., Jolna Apparel Group LLC, and Norman Shatz Co., U.S.A., (collectively, "Plaintiffs"), individually, and on behalf of all those similarly situated, bring this class action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and allege as follows:

## NATURE OF THE ACTION

1.     This case arises out of a conspiracy to fix prices and allocate customers and markets in the United States and worldwide for "Fasteners," (defined below) which are used for fastening materials together in products used primarily in the textile, apparel, footwear, and luggage industries.  Pursuant to the conspiracy, Defendants agreed to: allocate customers and markets; fix prices, including minimum, average and target prices; monitor price increases; and coordinate price increases.  All of these actions were conducted as a part of an on-going, international conspiracy of decades-long duration.  Each of the Defendants participated in the conspiracy during the Class Period.

2.     Plaintiffs bring this case as a class action on behalf of themselves and other persons and entities who, from at least as early as January 1, 1991 and continuing until at least

September 19, 2007 (hereinafter, the "Class Period"), purchased Fasteners in the United States directly from one or more Defendants. Plaintiffs assert all claims that may be brought against Defendants pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

3.     As a direct and proximate result of Defendants' unlawful conspiracy, Plaintiffs and the members of the Class have purchased Fasteners at prices that were artificially higher than they would have been absent the conspiracy. As a result, Plaintiffs and the members of the Class have suffered injury to their business and property.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and Section 4 of the Clayton Act, 15 U.S.C. §15(a).

5.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and pursuant to 28 U.S.C. § 1391(b), (c) and (d), because at all times relevant to the Complaint: (a) Defendants have transacted business, were found, and/or acted through subsidiaries or agents present in this District; (b) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District; and/or (c) a substantial portion of the affected interstate and foreign trade and commerce described below was carried out in this District.

6.     This Court has personal jurisdiction over Defendants because each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Fasteners to and/or in the United States, including in this District; (c) had substantial contacts with the United States, including this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to persons residing in, located in, or doing business in the United States, including in this District.

2

## PLAINTIFFS

7.      Plaintiff Fishman & Tobin, Inc. ("Fishman & Tobin") is a Pennsylvania corporation with its principal place of business in Conshohocken, Pennsylvania. During the Class Period, Fishman & Tobin purchased Fasteners in the United States directly from one or more of the Defendants at prices greater than it would have paid absent the conspiracy alleged herein.

8.      Plaintiff Greco Apparel, Inc. ("Greco Apparel") is a Pennsylvania corporation with its principal place of business in Ambler, Pennsylvania. During the Class Period, Greco Apparel purchased Fasteners in the United States directly from one or more of the Defendants at prices greater than it would have paid absent the conspiracy alleged herein.

9.      Plaintiff Jolna Apparel Group LLC ("Jolna Apparel") is a California limited liability company with its principal place of business in Tarzana, California. During the Class Period, Jolna Apparel purchased Fasteners in the United States directly from one or more of the Defendants at prices greater than it would have paid absent the conspiracy alleged herein.

10.      Plaintiff Norman Shatz Co., U.S.A. ("Norman Shatz") is a Pennsylvania corporation with its principal place of business in Bensalem, Pennsylvania. During the Class Period, Norman Shatz purchased Fasteners in the United States directly from one or more of the Defendants at prices greater than it would have paid absent the conspiracy alleged herein.

## DEFENDANTS

### The Prym Group Defendants

11.      Defendant William Prym GmbH & Co. KG ("Prym GmbH") is a German company with its principal place of business located at Zweifaller Strasse 130, D-52224 Stolberg, Germany. Prym refers to itself and its subsidiaries collectively as a single integrated

family of companies called "the Prym Group." According to the Prym Group website, the "Prym Group's sales team and production facilities are located around the globe, while the company operates in every major market worldwide," including the United States. Prym GmbH is made up of three divisions, Prym Consumer, Prym Fashion, and Inovan, and has sales offices and production facilities located in over 60 countries around the world. During the Class Period, Prym GmbH manufactured, sold, marketed, and/or distributed Fasteners to customers throughout the United States, either directly or through its predecessors, subsidiaries, or affiliated companies.

12.     Prym GmbH dominated and controlled the finances, policies and business practices of Defendants Prym Consumer USA, Inc., Prym Fashion, Inc., and other affiliated entities not named as defendants, relating to the antitrust violations alleged in this Complaint, which injured Plaintiffs and members of the Class. Plaintiffs' claims arise out of Prym GmbH's contacts with this District. Prym GmbH knew, or had good reason to know, that its conduct would have injurious effects in the United States.

13.     Defendant Prym Consumer USA, Inc. ("Prym Consumer USA") is a South Carolina corporation that is part of the Prym Consumer Group. Prym Consumer USA's principal place of business is located at 950 Brisack Road, Spartanburg, South Carolina 29303. Prior to 2005, Prym Consumer USA was known as Prym Dritz Corporation. Prym Consumer USA is a wholly-owned and controlled subsidiary of the U.S. holding company William Prym, Inc., which is, in turn, a wholly-owned and controlled subsidiary of Prym GmbH. During the Class Period, Prym Consumer USA, Inc. manufactured, sold and/or distributed Fasteners to customers throughout the United States.

4

14.     Defendant Prym Fashion, Inc. ("Prym Fashion") is a South Carolina corporation and is part of the Prym Fashion Group. Prym Fashion's principal place of business is located at 950 Brisack Road, Spartanburg, South Carolina 29303. Prym Fashion is a wholly-owned and controlled subsidiary of Prym Inovan GmbH Co. KG of Stolberg, Germany, which is, in turn, a wholly-owned and controlled subsidiary of Prym GmbH. Prym Fashion, Inc. merged with Prym Consumer USA on November 29, 2006. Prym Consumer USA is the surviving entity. During the Class Period, Prym Fashion manufactured, sold and/or distributed Fasteners to customers throughout the United States.

15.     Defendants Prym GmbH, Prym Consumer USA and Prym Fashion, together with other affiliated entities not named as defendants, are collectively referred to herein as "Prym" or the "Prym Group."

## The YKK Group Defendants

16.     Defendant YKK Corporation is a Japanese corporation with its principal place of business located at 1, Kanda Izumi-cho, Chiyoda-ku, Tokyo 101-8642, Japan. YKK Corporation refers to itself and its subsidiaries as a single integrated family of companies called the "YKK Group." During the Class Period, YKK Corporation manufactured, sold and/or distributed Fasteners to customers throughout the United States, either directly or through its predecessors, subsidiaries, or affiliated companies.

17.     This Court can exercise personal jurisdiction over YKK Corporation because, among other things:

      a.     YKK Corporation presents itself as a global conglomerate, "zipping around the globe." YKK Corporation is the largest manufacturer of zippers in the world with

114 affiliated companies operating in 70 countries throughout the world, including the United States;

        b.     The YKK Group management structure is global, with YKK Corporation functioning both as a Group headquarters and as a business entity.  The Fastening Products Group and Machinery and Engineering Group are "handled by" YKK Corporation;

        c.     The YKK Corporation Fastening Products Group quality management standards and zipper testing methods ensure the quality, safety and reliability on its products at a "global level."  In furtherance of its standards, YKK Corporation collects "the zipper samples from [its] regional manufacturing base and check[s] the quality level of the products regularly;" and

        d.     YKK Corporation holds numerous patents in the United States and has obtained trademark registrations in the United States for Fasteners and related products.  YKK Corporation first started using the YKK mark in the United States in approximately 1949.  YKK Corporation has availed itself of the courts in the United States and has commenced actions in the United States seeking recovery under federal, state and common law theories of liability, including trademark infringement, negligence and breach of contract.  YKK Group operates defined benefit plans in the United States.

        18.     YKK Corporation dominated and controlled the finances, policies and business practices of Defendants YKK Corporation of America, YKK (U.S.A.) Inc., YKK Snap Fasteners America, Inc. and other affiliated entities not named as Defendants, relating to the antitrust violations alleged in this Complaint, which injured Plaintiffs and members of the Class. Plaintiffs' claims arise out of YKK Corporation's contacts with this District.  YKK Corporation

knew, or had good reason to know, that its conduct would have injurious effects in the United States.

19.     Defendant YKK Corporation of America, Inc. ("YKK America") is a New York corporation with its principal place of business located at One Parkway Center, 1850 Parkway Place, Suite 300, Marietta, Georgia 30067.  YKK America is the YKK Group's Western Hemisphere parent.  It is ultimately a wholly-owned and controlled subsidiary of YKK Corporation.  During the Class Period, YKK Corporation of America manufactured, sold and/or distributed Fasteners to customers throughout the United States, either directly or through its predecessors, subsidiaries, or affiliated companies.

20.     Defendant YKK (U.S.A.) Inc. ("YKK (U.S.A.)") is a New York corporation with its principal place of business located at 1300 Cobb Industrial Drive, Marietta, Georgia 30066. YKK (U.S.A.) is ultimately a wholly-owned and controlled subsidiary of YKK Corporation. YKK (U.S.A.) operates the Fastening Products Group in the United States, with sales and service offices located in Rutherford, New Jersey; New York, New York; Anaheim, California; Renton, Washington; Addison, Texas; and Glenview, Illinois.  It is the largest zipper producer in the United States.  During the Class Period, YKK (U.S.A.) manufactured, sold and/or distributed Fasteners to customers throughout the United States.

21.     Defendant YKK Snap Fasteners America, Inc. ("YKK Snap Fasteners") is a Delaware corporation with its principal place of business located at 302 Factory Street, Lawrenceburg, Kentucky 40342. YKK Snap Fasteners is ultimately a wholly-owned and controlled subsidiary of YKK Corporation.  A predecessor of YKK Snap Fasteners was Universal Fasteners, Inc., which made Fasteners in the United States for almost 100 years, before

it was purchased by YKK in 1987. During the Class Period, YKK Snap Fasteners manufactured, sold and/or distributed Fasteners to customers throughout the United States.

22.     Defendants YKK Corporation, YKK America, YKK (U.S.A.), and YKK Snap Fasteners, together with other affiliated entities not named as defendants, are collectively referred to herein as "YKK" or the "YKK Group."

**The Coats Group Defendants**

23.     Defendant Coats plc is a United Kingdom corporation with its principal place of business at 1 The Square, Stockley Park, Uxbridge, Middlesex, UB11 ITD, United Kingdom. In the early 1990s, Coats plc acquired Talon, Inc., a United States zipper company. During the Class Period, Coats plc manufactured, sold and/or distributed Fasteners to customers throughout the United States, either directly or through its predecessors, subsidiaries, or affiliated companies.

24.     This Court can exercise personal jurisdiction over Coats plc because, among other things:

a.     Coats plc refers to itself and its subsidiaries as a single integrated family of companies collectively referred to as "Coats.". Coats plc professes to be the world's second largest supplier of zippers with over 22,000 employees in 71 countries around the world, including the United States. The "global presence and size" of Coats plc have allowed it to "build strategic partnerships with global suppliers" enabling it to "optimize its cost base and guarantee the consistent quality of its products worldwide;"

b.     Coats plc aims "to exploit the advantages of [its] unique global position to generate solid and sustainable returns." Coats plc claims it has the "widest global spread" and

most comprehensive service capability of any company in the apparel supply chain, professing to service customers "throughout the world" through its "global network of operations;"

      c.     In addition to Fasteners, Coats plc sells other products in the United States. Coats plc declares itself the "leading supplier of thread" in the United States and considers the United States one of its "[k]ey markets for crafts;"

      d.     A large portion of the operating profit of Coats plc stems from North America operations. For example, the operating profit for total continuing operations attributable to North America was £ 40.6 million of £ 92.7 (43.5 percent) in 1999 and £ 43.1 million of £ 114.8 million (37.5 percent) in 2000; and

      e.     Coats plc and its United States subsidiaries use a common mark and collectively refer to themselves as Coats. For example, Richard Norman, Vice President for Human Resources, Coats North America, referred to his employer as Coats, not Coats North America, in his testimony during a Hearing before the Committee on Ways and Means of the United States House of Representatives on July 12, 2006: "My company, Coats, employs 25,000 employees worldwide and has manufacturing locations in more than 60 countries... Here in the United States, we employ over 1,800 workers in the Carolinas, Georgia, Nevada, and New Hampshire."

     25.    Coats plc dominated and controlled the finances, policies and business practices of Defendants Coats Holdings, Inc., Coats American, Inc., Coats North America de Republica Dominicana, and Coats and Clark, Inc. relating to the antitrust violations alleged in this Complaint, which injured Plaintiffs and members of the Class. Plaintiffs' claims arise out of Coats plc's contacts with this District. Coats plc knew, or had good reason to know, that its conduct would have injurious effects in the United States.

26.     Defendant Coats Holdings, Inc. ("Coats Holdings") is a Delaware corporation with its principal place of business at 3430 Toringdon Way, Suite 301, Charlotte, North Carolina 28277. Coats Holdings is ultimately a wholly-owned subsidiary of Coats plc. During the Class Period, Coats Holdings manufactured, sold and/or distributed Fasteners to customers throughout the United States, either directly or through its predecessors, subsidiaries, or affiliated companies.

27.     Defendant Coats American, Inc., d.b.a. Coats North America ("Coats American") is a New Jersey corporation with its principal place of business at 3430 Toringdon Way, Suite 301, Charlotte, North Carolina 28277. Coats American is ultimately a wholly-owned subsidiary of Coats plc. During the Class Period, Coats American manufactured, sold and/or distributed Fasteners to customers throughout the United States, either directly or through its predecessors, subsidiaries, or affiliated companies.

28.     Defendant Coats North America de Republica Dominicana ("Coats North America") is a North Carolina corporation with its principal place of business at 3430 Toringdon Way, Suite 301, Charlotte, North Carolina 28277. Coats North America is ultimately a wholly-owned subsidiary of Coats plc. During the Class Period, Coats North America manufactured, sold and/or distributed Fasteners to customers throughout the United States, either directly or through its predecessors, subsidiaries, or affiliated companies.

29.     Defendant Coats and Clark, Inc. ("Coats and Clark") is a Delaware Corporation with its principal place of business at 3430 Toringdon Way, Suite 301, Charlotte, North Carolina 28277. Coats and Clark is ultimately a wholly-owned subsidiary of Coats plc. During the Class Period, Coats and Clark manufactured, sold and/or distributed Fasteners to customers throughout

the United States, either directly or through its predecessors, subsidiaries, or affiliated companies.

30.     Defendants Coats plc, Coats Holdings, Coats American, Coats North America, and Coats and Clark together with other affiliated entities not named as defendants, are collectively referred to herein as "Coats" or the "Coats Group."

**The Scovill Group Defendants**

31.     Defendant Scovill Fasteners, Inc. ("Scovill Fasteners") is a Delaware corporation with its principal place of business located at 1802 Scovill Drive, Clarkesville, Georgia 30523. Scovill Holdings, Inc. was a Delaware corporation and the parent of the Scovill Group until August 3, 2001 when it merged with Scovill Fasteners, which became the surviving entity of the merger.  During the Class Period, Scovill Fasteners manufactured, sold and/or distributed Fasteners to customers throughout the United States, either directly or through its predecessors, subsidiaries, or affiliated companies.

32.     Scovill Fasteners, together with other affiliated entities not named as defendants, are collectively referred to herein as "Scovill" or the "Scovill Group."

**CO-CONSPIRATORS AND AGENTS**

33.     Wherever in this Complaint reference is made to any act, statement or transaction of any corporation or entity, the allegation means that the corporation or entity engaged in the act or transaction, or made the statement, by or through its officers, directors, members, partners, agents, employees or representatives while they were engaged in the management, direction, control or conduct of the corporation's or entity's business or affairs and acting within the scope of their authority.

34.    Various other persons, firms and corporations not named as defendants herein have participated as co-conspirators in the violations alleged herein and have aided, abetted and performed acts and made statements in furtherance thereof.

## FACTUAL ALLEGATIONS

## Definitions

35.    The term "Fasteners," as used herein, includes zippers, snap fasteners, jeans buttons, hooks and eyes, clamping locks, clip fasteners and rivets, whether made of metal or plastic, which are used for fastening materials together in a variety of products used primarily in the textile, apparel, footwear and luggage industries.

36.    Zippers (also known as "zip fasteners") temporarily join two adjoining pieces of fabric. "Other Fasteners," as used herein, are Fasteners other than zippers. Attaching machines are used to attach the different parts of the fastening products together and to attach these products to the different types of textiles, leather goods and garments. The Fasteners manufacturers offer the machines to their industrial customers, often on a rental basis.

## Meetings and Communications of Defendants in Furtherance of the Conspiracy

37.    Plaintiffs allege that Defendants participated in a conspiracy to control the worldwide Fasteners market, including the market for Fasteners in the United States. In furtherance of the conspiracy, beginning at least as far back as 1991, high-ranking members of Defendants' management participated in meetings, some of which are identified below, and otherwise communicated with each other about the prices of Fasteners throughout the world, including the United States. Through these meetings and other communications, Defendants discussed and agreed upon Fasteners prices, allocated markets and customers, and shared sensitive information about their current operations and future business plans. Many of these

12

meetings and communications related directly to the United States Fasteners market.  Although

certain other meetings and communications were focused primarily upon European or other

markets, those collusive activities also directly affected the United States market due to the

importation of Fasteners into the United States from those overseas markets.

38.     One of the means Defendants used to effectuate this conspiracy was to fix the

price of "anchor products," which were then used to set prices of other products, including the

prices of Fasteners in the United States.  The prices of fasteners in the United States were based

upon the prices that were fixed as a result of this and as discussed in the meetings and

communications set forth below.

39.     Prior to the beginning of the Class Period, the Prym Group and the Coats Group

entered into an unlawful worldwide product allocation agreement.  Under the terms of this

agreement, Prym and Coats agreed not to become active in the primary market segment of the

other party without its consent.  Thus, it was agreed that Coats would not enter the Prym Group's

primary markets, which, at the time, were Other Fasteners and needles.

40.     On October 17, 1975, representatives of Prym and Coats, including Messrs. Bell

and Henry (Coats' new chairman of the board) met in Glasgow, Scotland and agreed, among

other things, that Mr. Bell would arrange a meeting between Prym and the management of Coats

and Clark to discuss future business opportunities in the United States.

41.     In a meeting at Stolberg, Germany, on November 16 and 17, 1975, attended by,

among others, Messrs. Dieter Prym and Friedlander of Prym, and Mr. Bell of Coats, several

general principles were agreed to, including the maintenance or improvement of current price

levels.  Also discussed were United States sales and marketing strategies.

42.     These general principles governing the agreement between Coats and Prym were amplified in a document dated January 15, 1977.  With respect to the "rest of the world," other than Europe, Coats agreed not to manufacture or distribute certain products, including Other Fasteners, without the prior consent or consultation of Prym.  Prym and Coats recognized that their product allocation agreement was not legally enforceable, but nonetheless they confirmed that they considered the agreement to be a "moral obligation" binding upon both parties.  This agreement continued throughout the Class Period.

43.     Having secured Coats' agreement, Prym entered into anticompetitive agreements with respect to the sale of Fasteners and their related attaching machines with the YKK Group and the Scovill Group.

44.     Among the  conspiratorial meetings and communications between and among the Defendants were, *inter alia*, the following:

a.      Beginning in 1991, as part of the conspiracy, members of the senior management of Prym Group, YKK Group and Scovill Group held a series of anticompetitive meetings, during which they discussed the marketing, sale and pricing of Other Fasteners.

b.      A meeting between Prym and Coats was held in Stolberg on July 15, 1998.  The representatives of Coats were Messrs. Martin Flower, Nigel Garrow, Paul Smith, Arthur Grossett and Dieter Laule.  The representatives of Prym were Axel Prym, Dieter Exeler and Lobertus Griesmeyer.  Messrs. Prym and Flower were the chief executive officers of Prym and Coats, respectively.  (Mr. Flower also was a director of Coats American.)  During this meeting, Coats and Prym exchanged detailed information about their respective worldwide Fasteners businesses.  The parties also discussed sales of zippers in the American market.  There were also discussions about Opti, a Coats' subsidiary that manufactured zippers and that had

been acquired in the years following the original agreement with Prym. In particular, the parties noted that they did not want price competition between the companies on zippers.

      c.      Axel Prym met with David Gilchrist (managing director of Coats China) on or about November 9, 1998. The meeting took place at the offices of Prym Asia Pacific & Co. (a joint venture of Prym and Coats) in Hong Kong. Among the items discussed were the need for Prym to further expand certain of its sales activities in Western Europe and the United States.

      d.      In approximately May 1999, Mr. Inoue (YKK's worldwide managing director, responsible for its global Fastener business) called Axel Prym and asked him to arrange a meeting with Coats. The meeting between Prym, Coats and YKK took place on June 2, 1999 in Ratingen, Germany.

      e.      On June 15, 1999, David Manns of Coats Asia Pacific in Singapore wrote Raymond Hartmann of Prym Fashion suggesting a meeting in Spartanburg, South Carolina to "swap notes" about "target customers" and other matters.

      f.      During an August 13, 1999 meeting between Axel Prym and Messrs. Nishio and Tsubokawa of YKK, the parties discussed YKK's global structure and possible global cooperation between YKK and Prym with respect to Other Fasteners. Among other things, the participants discussed the concept of a worldwide minimum price provision and cooperation on global accounts.

      g.      At a meeting in Dusseldorf, Germany, Axel Prym was informed by YKK that it would be implementing a multi-continent strategy that would lead to standardization of its products and prices.

15

h. On February 7, 2000, Axel Prym and Nick Tsubokawa (who was in charge of YKK's worldwide press fasteners operations and was, or had been, president and CEO of YKK America) discussed and committed to future price increases by YKK and Prym. The participants specifically agreed that price increases must be accomplished in North America.

i. On approximately February 13, 2000, Axel Prym met in Japan with Messrs. Inoue and Tsubokawa of YKK and discussed YKK's sales of Fasteners in the United States as well as problems related to a United States customer. They also discussed a "gentleman's agreement" between YKK and Scovill regarding an allocation of customers.

j. During a December 14, 2000 meeting between Messrs. Strey and Nishio of YKK and Messrs. Exeler and Prym of Prym, the participants agreed on minimum prices for Fasteners. Specific prices were set for certain individual countries and a separate minimum price was set for the rest of the world, which included the United States.

k. A meeting, attended by representatives of the YKK Group, the Prym Group and the Scovill Group, took place in Ratingen, Germany on January 9, 2001. The participants were Messrs. Strey (YKK), Wright (Scovill), and Axel Prym. Confidential market information of the companies was exchanged during this meeting.

l. On February 7, 2001, Axel Prym met with Martin Flower of Coats in London. During this meeting they discussed the United States market, including methods to achieve further growth, and their respective gross margins in the United States. Mr. Flower informed Mr. Prym that he and Bernie Loftus (vice president of Defendant Coats & Clark) were very concerned about whether Tilo Toegel of Prym adequately understood certain aspects of the American market.

16

m.      A meeting between Messrs. Axel Prym, and Strey of YKK, and Vincent
Catrini and Frank Wright of Scovill was held in Ratingen, Germany on March 15, 2001.  Scovill
reported that business in the United States market was weak, but that it had significantly
increased its sales of jeans buttons and rivets in the United States and Canada during the past 4 to
5 years.  Scovill also revealed its pricing and marketing strategy in the United States.

n.      Notes dated May 11, 2001, reflect additional communications between
YKK and Prym.  YKK proposed a mutual product exchange for certain products, including snap
fasteners, jeans buttons and grommets.  Prym agreed in principle to the proposal, which would
initially be limited to Europe, but could subsequently be extended worldwide.  YKK and Prym
also discussed customer pricing and future price increases, and discussed and agreed upon
certain terms relating to machine rentals.

o.      In a May 25, 2001 email regarding "Specifying Business/Cooperation with
Coats," Raymond Hartmann, the managing director of Prym Fashion, in the United States, stated
that:

> for the last 2 years I've been enjoying fruitful exchanges of information
> (contact names, background of target customers) with Coats America.  In
> view of this mutually positive experience, Coats would like to expand this
> kind of cooperation also for Europe.  To this end, Coats headquarters in
> Glasgow has appointed Mr. Ronald MacNiven to the position of Director
> European Key Accounts.  Renate May and I know Mr. MacNiven as
> General Manager of Coats Philippines where he was stationed the last few
> years and I met with him again last week in Spartanburg [South Carolina].
> Ronald intends to make contact with you shortly.  May I suggest that you
> share your experience in the European specifying business with him.  I'm
> sure Mr. MacNiven's forthcoming activities on behalf of Coats will also
> benefit you soon.

p.      An internal Prym document drafted in the early 2000s referenced a
violation of the Coats/Prym agreement with respect to the marketing and sale of Fasteners in the
United States and Mexico.

q.      On June 11, 2002, Axel Prym met with Messrs. Tsubokawa and Nishio of YKK. At this meeting, YKK complained about the price and other aspects of Prym's rental of attaching machines to a United States customer and also discussed YKK Universal's rental policies for attaching machines in the United States. YKK and Prym also discussed confidential worldwide and United States' sales estimates, YKK's United States zipper market share, and their respective return on invested capital goals.

r.      On October 15, 2002, Axel Prym again met with one or more representatives of YKK, and discussed a proposal under which Prym and YKK would serve as the "price leader" for Fastener products and/or attaching machines for certain customers in different parts of the world, including the United States.

s.      In a meeting with Prym on January 13, 2003, Messrs. Strey and Nishio of YKK proposed the development of a worldwide price matrix using a 15 ligne product as the anchor product off which other products would be priced.

45.      In addition to the above-referenced meetings, which directly implicate the worldwide and/or United States Fasteners markets, members of Defendants' senior management met on numerous other occasions to discuss the marketing, sale and pricing of Fasteners. For example, representatives of Prym, Scovill and YKK, among others, met within the framework of the Baseler, Wuppertaler and the Amsterdamer "work circles." The circle meetings were organized by the German trade association Fachverband Verbindungs- und Befestigungstechnik ("VBT"), which also acted as a "secretariat" for each of the circles.

46.      Beginning in 1991, the Baseler circle met on 18 different occasions in cities that include Beaune, France, Basel, Switzerland, Budapest, Hungary, Florence, Italy, Munich,

Germany, Bruges, Belgium, Vienna, Austria, Venice, Italy, Zurich, Switzerland, Lyon, France, and Amsterdam, Netherlands.  Members of Prym's and YKK's senior management were present at all 18 of these meetings; Scovill's senior management attended 14 of the meetings.

47.     Beginning in 1991, the Wuppertaler circle met on at least 15 different occasions. Members of Prym's and YKK's senior management were present at 14 and 15 of these meetings, respectively.  Each meeting took place in Dusseldorf, Germany with the exception of the November 25, 1997 meeting, which was in Ratingen, Germany.

48.     The Amsterdamer circle met in January and March, 2001 in Ratingen.  In attendance at this meeting were members of Prym's, YKK's and Scovill's senior management.

49.     The Baseler, Wuppertaler and Amsterdamer circle meetings were part of the same continuous attempt to distort competition.  The Wuppertaler circle was comprised exclusively of German manufacturers, whereas the Baseler and Amsterdamer circle meetings included other manufacturers.  In the Wuppertaler circle, the focus was on matters relating to the German market, although price increases for exports to non-German markets were also discussed, whereas in the Baseler and the Amsterdamer circles the focus was on Europe-wide matters.

50.     Although the general focus of these meetings was on markets outside the United States, millions of dollars of Defendants' Fasteners were imported into the United States during the Class Period from Germany and other countries within the European Union, and elsewhere, where, they were purchased by Class members at supra-competitive prices, thereby directly affecting the United States market.

51.     Defendants and/or their subsidiaries also were members of various trade groups during the Class Period, such as the American Apparel Producers Network, the International Apparel Federation, the Industrial Fabrics Association International, the Sewn Products

Equipment & Suppliers of the Americas, and the American Apparel & Footwear Association.
Defendants were present at meetings held by these groups and at other trade shows, including the
Bobbin show, which met annually or semi-annually in Atlanta, Georgia.  These meetings
provided additional opportunities for Defendants to meet in furtherance of their conspiracy.

52.     Each of the Defendants participated in the conspiracy with respect to Fasteners
during the Class Period.  No Defendant ever withdrew from the conspiracy, and thus, all
Defendants are jointly and severally liable for all of the unlawful conduct under the antitrust laws
of the United States.

## The European Commission's Fasteners Proceeding

53.     The existence of the conspiracy was revealed publicly for the first time on
September 19, 2007, when the European Commission issued a press release (the "EC Press
Release") announcing the imposition of fines totaling 328.644 million euros (approximately
$458 million at the time of the EC Press Release) on members of the YKK, Prym, Coats, and
Scovill Groups (including YKK Corporation, Prym GmbH, Coats plc and Scovill Fasteners),
together with two other European manufacturers and the VBT, "for operating cartels on the
markets for fasteners and attaching machines in Europe and *worldwide*" (emphasis added).

54.     The Commission stated that it had uncovered evidence that revealed the existence
of anticompetitive agreements in the markets for "zip fasteners, other fasteners (e.g. snap
buttons, rivets) and their attaching machines."  This evidence included numerous documents and
statements provided by members of the YKK Group, the Prym Group, and the Coats Group.

55.     The fines (in euros) imposed upon Defendants were as follows: YKK Group -
150,250,000; Coats Group - 122,405,000; Prym Group - 40,538,000; and Scovill Group
6,002,000.  The Commission imposed these fines based upon its findings that Defendants had

agreed with each other on coordinated price increases, minimum prices, allocation of customers, the sharing of markets, and the exchange of other commercially important and confidential information.

56.     These fines would have been even higher, but the European Commission granted leniency to members of the Prym, YKK and Coats Groups, and substantially reduced the amounts of their fines.  In order to receive leniency from the Commission, the Prym, YKK and Coats Groups were required to admit the existence of the conspiracy, identify the participants, provide evidence of the conspiracy, and confess to their own and their co-conspirators' participation in the unlawful conduct.

57.     The Commission uncovered evidence that high-ranking management of the Defendants and their co-conspirators (e.g., managing directors, sales directors, and board members) had participated in regular meetings and discussions.  The Commission also found evidence that the Defendants were aware that their conduct was illegal.

58.     In a September 19, 2007 press release, the Prym Group admitted that individuals at the highest level of management, who had responsibilities with respect to the United States Fasteners market, were actively involved in the conspiracy: "The members of the board of management of the Prym Group in charge at the times of the cartels, who are no longer active in the Prym undertakings, have at all times admitted the participation and cooperated with the Commission in its investigations."

59.     In the EC Press Release, dated September 19, 1997, EC Competition Commissioner Neelie Kroes stated,

> It is unacceptable that the major fastening technology producers colluded for such a long time to maintain artificial price levels and to share customers and markets for products which are used every day by a lot of consumers.  The highest management of these

21

companies was well aware that this conduct was illegal, but
decided to continue anyway.

## CHARACTERISTICS OF THE FASTENERS INDUSTRY

60.    A number of structural characteristics of the Fasteners industry facilitate the

implementation and maintenance of the worldwide conspiracy alleged herein.

61.    Fasteners are commodity-like products.  Many Fasteners products come in

standard sizes and major suppliers advertise their products under standard trade names.  This

suggests that products are easily characterized in the market by material composition, design and

function.  It is easier to form and sustain a conspiracy when the product in question is

commodity-like because it is easier to agree on prices to charge and to monitor those prices once

an agreement is formed.

62.    There appear to be few, if any, available substitutes for Fasteners.  In other

industries where substitutes are available, the effect of supra-competitive pricing is to induce

switching by purchasers to substitute products.  By contrast, when no substitutes are available,

conspirators can raise prices without purchasers being able to switch from the product.  The lack

of available substitutes for a product facilitates collusion among competitors.

63.    Because Fasteners represent a small portion of the total cost of an item of apparel,

purchasers are not as incentivized to resist price increases as they might be if the products were a

larger percentage of the overall item cost.

64.    The demand for Fasteners is driven by the industries in which they are applied,

most notably the apparel industry.

65.    Demand for Fasteners in the United States has been in significant decline since at

least 1995.  The United States apparel industry has seen production decline dramatically,

especially following the passage of NAFTA and the WTO, which hastened the shift of clothing

22

production overseas.  Such static or declining demand is another factor which makes the formation of a collusive arrangement more likely.  With static or declining demand, firms have a greater incentive to collude to avoid price competition.

66.     The Fastener industry in the United States is highly concentrated.  High concentration facilitates coordination since there are fewer conspirators among which to coordinate pricing or allocate markets, and it is easier to monitor pricing and production of other conspirators.  Here there is control of a large share of production by a few companies.  Together, the Defendants exercise a degree of control over the Fasteners market which far exceeds the United States Department of Justice's ("DOJ") guidelines for a highly concentrated industry.

67.     Prices for Fasteners have remained at similar levels or increased during the Class Period despite a material decline in demand since the mid-1990s.  The material decline in demand for Fasteners should have caused prices to decline.  In addition, manufacturing productivity has increased over the time period, making the products less costly to produce.  That rise in productivity should also have caused prices to decline in a competitive market but this did not occur.

## ANTITRUST INJURY

68.     The unlawful contract, combination or conspiracy alleged above had the following effects:

    a.     Prices charged by Defendants to Plaintiffs and the members of Class for Fasteners were maintained at artificially high and noncompetitive levels;

    b.     Plaintiffs and members of the Class were required to pay more for Fasteners than they would have paid in a competitive marketplace unfettered by Defendants' collusive and unlawful conduct; and

c.      Plaintiffs and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for Fasteners.

69.     During and throughout the period of the contract, combination or conspiracy alleged above, Plaintiffs and members of the Class directly purchased Fasteners from one or more Defendants.

70.     Plaintiffs and the other Class members paid more for Fasteners than they would have paid under conditions of free and open competition.

71.     As a direct and proximate result of the illegal contract, combination, or conspiracy alleged above, Plaintiffs and the members of the Class were injured and financially damaged in their businesses and property in amounts that are not presently determinable.

72.     Plaintiffs and the members of the Class have suffered antitrust injury of the type that the federal laws were meant to punish and prevent.

## CLASS ACTION ALLEGATIONS

73.     Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

74.     Plaintiffs bring this action against Defendants under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and other members of the following Class:

> All persons and entities who purchased Fasteners in the United States directly from a Defendant during the period from and including January 1, 1991 to and including September 19, 2007. Excluded from the Class are Defendants and their predecessors, successors, parents, subsidiaries, affiliates, divisions and governmental entities.

75.     Plaintiffs do not know the exact number of Class Members because such information is in the exclusive control of Defendants or their co-conspirators.  Due to the nature

of the trade and commerce involved, however, Plaintiffs believe that Class Members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States and elsewhere so that joinder of all Class Members is impracticable.

76.    There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof and to its fraudulent concealment.  The questions include but are not limited to:

a.    whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices for Fasteners purchased in the United States;

b.    the duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants in the furtherance of the conspiracy;

c.    the identity of participants in the conspiracy;

d.    whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.    the effect of Defendants' conspiracy on the prices of Fasteners purchased in the United States during the Class Period;

f.    whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business and property of Plaintiffs and other members of the Class;

g.    the appropriate measure of damages sustained by Plaintiffs and other members of the Class; and

h.    whether Defendants fraudulently concealed the conspiracy.

77.    Plaintiffs are members of the Class.  Plaintiffs' claims are typical of the claims of other members of the Class, and Plaintiffs will fairly and adequately protect the interests of the

members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class. In addition, Plaintiffs are represented by competent counsel experienced in the prosecution of class action antitrust litigation.

78.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, economically, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

80.     Defendants actively and fraudulently concealed the existence of, and their participation in, the conspiracy alleged above. As a result of these affirmative acts of concealment, neither Plaintiffs nor the class members had knowledge of the violations alleged herein until September 19, 2007 when the worldwide Fasteners conspiracy was revealed publicly for the first time by the EC Press Release. The first complaint against Defendants was filed shortly thereafter.

81.     Defendants engaged in a successful, illegal price-fixing, market-sharing and customer allocation conspiracy that, by its nature, was inherently self-concealing.

82.     Defendants secretly employed deceptive practices and techniques to avoid detection of, and to fraudulently conceal, their contract, combination or conspiracy.  Because of this, Plaintiffs and the Class members could not have discovered the alleged contract, combination or conspiracy at an earlier date by the exercise of reasonable diligence, which they did exercise.  While holding themselves out as honest competitors, Defendants fraudulently concealed the contract, combination or conspiracy herein alleged by various means and methods, including, but not limited to, secret meetings and surreptitious communications, and by giving false and pretextual reasons for increases in the prices of Fasteners sold by them during the Class Period, including falsely attributing such increases to increased raw material component costs as well as exchange rates.  Moreover, during the spring and summer of 2003, the Prym Group and YKK Group met to discuss the European Commission's request for information.  These meetings occurred on March 14, 2003, June 26, 2003 and July 10, 2003.  According to Prym, during the final meeting, a general defense strategy was discussed and the participants agreed to deny everything.

83.     The affirmative actions of the Defendants herein alleged were wrongfully concealed and carried out in a manner that precluded detection.

84.     By virtue of the fraudulent concealment by Defendants, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiffs and the Class members have as a result of the unlawful contract, combination or conspiracy alleged in the Complaint.

## INTERSTATE TRADE AND COMMERCE

85.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of and substantially affected interstate and foreign commerce.

86.     During the Class Period, Defendants and their co-conspirators sold and shipped substantial quantities of Fasteners in a continuous and uninterrupted flow of interstate or foreign commerce to customers located in states or countries other than the states or countries in which the Fasteners were produced.

## CLAIM FOR RELIEF

### Violation of 15 U.S.C. § 1

87.     Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

88.     Beginning at least as early as January 1, 1991, and continuing until at least September 19, 2007, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into and engaged in a contract, combination or conspiracy to fix, raise, maintain or stabilize prices, to allocate customers, and to share markets for Fasteners in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

89.     For the purpose of formulating and effectuating the aforesaid contract, combination or conspiracy, upon information and belief, Defendants, acting through high-ranking management, engaged in anticompetitive activities that included:

    a.     Participating in meetings, conversations and communications concerning Fasteners price increases, minimum prices, customer allocation, the sharing of markets, and the exchange of other commercially important and confidential information;

28

b.      Agreeing on coordinated price increases, minimum prices, allocation of customers, sharing of markets, and the exchange of other commercially important and confidential information relating to Fasteners; and

c.      Selling Fasteners to Class Members at supra-competitive prices in accordance with the agreements reached.

90.     Plaintiffs and the Class Members paid more for Fasteners than they would have paid under conditions of free and open competition.  As a direct and proximate result of the illegal contract, conspiracy, or combination alleged above, Plaintiffs and Class Members were injured and financially damaged in their business and property, in amounts to be determined according to proof, and they are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

91.     The conduct of Defendants constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

a.      The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed class representatives and that Plaintiffs' counsel be appointed as counsel for the Class.

b.      The contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants, be adjudged a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

c.      Judgment be entered for Plaintiffs and members of the Class against Defendants, jointly and severally, for three times the amount of damages sustained by Plaintiffs

and the Class as allowed by law, together with the costs of the action, including reasonable

attorneys' fees, and pre- and post-judgment interest.

      d.     Plaintiffs and members of the Class be granted such other, further and

different relief as the case may require and the Court may deem just and proper under the

circumstances.

## JURY DEMAND

      Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial of all issues so triable.

Dated: May 24, 2010

Warren Rubin
Eileen Lavin
LAW OFFICES BERNARD
M. GROSS, P.C.
John Wanamaker Building, Suite 450
Juniper and Market Streets
Philadelphia, PA  19107
(215) 561-3600

Joseph C. Kohn
Douglas A. Abrahams
KOHN, SWIFT, & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
(215) 238-1700

Gerald J. Rodos
Mark R. Rosen
Jeffrey B. Gittleman
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
(215) 963-3600

Robert N. Kaplan
Linda P. Nussbaum
Jason A. Zweig
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY  10022
(212) 687-1980

INTERIM CO-LEAD COUNSEL FOR THE U.S. LAW CLAIM PLAINTIFFS

## CERTIFICATE OF SERVICE

I, Warren Rubin, Esquire, hereby certify that a true and correct copy of

**CONSOLIDATED CLASS ACTION COMPLAINT** was served on the below listed counsel

on the 24th of May via email.

Joseph F. Wayland
Christopher J. Lucht
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jwayland@stblaw.com
clucht@stblaw.com

*Attorneys for Defendants Coats plc Coats Holdings,
Inc. and Coats North America de Republica
Dominicana, Inc.*

Steven A. Reiss
Justin Wagner
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
steven.reiss@weil.com
justin.wagner@weil.com

*Attorneys for Defendants William Prym
GmbH & Co. KG, Prym Consumer USA,
Inc., and Prym Fashion, Inc.*

Peter E. Halle
J. Clayton Everett, Jr.
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 739-5225
phalle@morganlewis.com
jeverett@morganlewis.com

*Attorneys for Defendants YKK Corporation, YKK
Corporation of America, Inc., YKK (U.S.A.)
Inc., and YKK Snap Fasteners America, Inc.*

John G. Despriet
Womble Carlyle Sandridge & Rice, PLLC
271 17th Street, NE
Suite 2400
Atlanta, GA  30363
jdespriet@wcsr.com

*Attorneys for Defendant Scovill Fasteners,
Inc.*

Michael D. Hausfeld
HAUSFELD LLP
1700 K. Street, N.W.
Suite 650
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeldllp.com

Solomon B. Cera
GOLD BENNETT CERA
 & SIDENER LLP
595 Market Street
Suite 2300
San Francisco, CA 94105
(415) 777-2230
 scera@gbcslaw.com

*Non-United States Law Claim Plaintiffs*

WARREN RUBIN