IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE FASTENERS ANTITRUST          :
LITIGATION                         :          CIVIL ACTION
                                   :
                                   :          NO. 08-md-1912

**SURRICK, J.**                                    **AUGUST  12 , 2011**

**MEMORANDUM**

Presently before the Court are Coats plc's Motion to Dismiss the Complaint for Lack of

Personal Jurisdiction (ECF No. 69),[1] Defendants' Joint Motion to Dismiss the Complaint (ECF

No. 70),[2] Defendant YKK Corporation's Motion to Dismiss for Lack of Personal Jurisdiction

(ECF No. 71), and Coats plc's Motion to Dismiss the Complaint for Lack of Personal

Jurisdiction (ECF No. 73).  For the following reasons, Defendants' Joint Motion and YKK

Corporation's Motion will be denied.  Coats plc's Motion will be addressed after Plaintiffs have

conducted jurisdictional discovery.

## I.      BACKGROUND

This multi-district litigation is based on allegations that four groups of corporate

defendants engaged in a "conspiracy to fix prices and allocate customers and markets in the

United States and worldwide for 'Fasteners,'" in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1.  (Consol. Class Action Compl. ¶ 1, ECF No. 61.)  The term "Fasteners" includes

zippers, snap fasteners, buttons, hooks, and other similar products used primarily in the textile,

---

[1] Coats plc filed this Motion in error and thereafter filed a corrected version.  (*See* ECF Nos. 69, 73.)

[2] Scovill Fasteners, Inc., has filed a Supplemental Memorandum of Law in Support of the Joint Motion to Dismiss.  (ECF No. 72.)

apparel, footwear, and luggage industries. (*Id.* at ¶ 35.) Three groups of Defendants filed the

instant motions: (1) the "YKK Defendants," which include YKK Corporation, YKK Corporation

of America, Inc., YKK (U.S.A.) Inc., and YKK Snap Fasteners America, Inc.; (2) the "Coats

Defendants," which include Coats plc, Coats Holdings, Inc., Coats American, Inc., Coats North

America de Republica Domicana, Inc., and Coats and Clark, Inc.; and (3) Scovill Fasteners, Inc.[3]

Plaintiffs Fishman & Tobin, Greco Apparel, Inc., Jolna Apparel Group LLC, and Norman Shatz

Co., U.S.A. (collectively, "Plaintiffs") bring this consolidated class action on behalf of

themselves and others who purchased Fasteners in the United States from Defendants from

January 1, 1991, until September 19, 2007 (the "Class Period"). (*Id.* at ¶ 2.)

Plaintiffs allege that during the Class Period, high-ranking members of Defendants'

management participated in meetings during which they fixed prices, allocated markets and

customers, and shared sensitive business information. (*Id.* at ¶ 37.) Plaintiffs further allege that

Defendants' collusive communications, many of which occurred in Europe, both directly targeted

and directly affected the United States Fasteners market. (*Id.*) Specifically, Plaintiffs allege that

beginning in 1991, senior management of the Prym, Scovill, and YKK Defendants convened in

"work circles" under the auspices of a German trade association. (*Id.* at ¶¶ 45-50.) Plaintiffs

assert that during these meetings, Defendants attempted to distort competition. (*Id.* at ¶ 49.)

In addition, Plaintiffs cite a multitude of specific dates, between 1998 and 2003, on which

---

[3] The Prym Defendants have entered into a settlement agreement with Plaintiffs. (ECF No. 56.) In addition, on April 19, 2011, Scovill filed for Chapter 11 bankruptcy. (Scovill's Notice of Bankruptcy Filing, ECF No. 91.) The proceedings in this matter are automatically stayed as to Scovill. *See* 11 U.S.C § 362(a)(1). This litigation may proceed against the remaining Defendants. *See McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509-10 (3d Cir. 1997) (citing 11 U.S.C § 362(a)); *Lane v. CBS Broad. Inc.*, 612 F. Supp. 2d 623, 626 n.1 (E.D. Pa. 2009) (citing cases).

Defendants purportedly colluded.  (*See id.* at ¶ 44.)  For example, on July 15, 1998, members of the Prym and Coats Defendants, including their chief executive officers, exchanged detailed information about their worldwide Fasteners businesses.  (*Id.* at ¶ 44(b).)  On August 13, 1999, members of the Prym and YKK Defendants discussed a worldwide price provision, YKK's global structure, and global cooperation.  (*Id.* at ¶ 44(f).)  In a meeting between the Prym and YKK Defendants on February 13, 2000, the participants discussed the sales of Fasteners in the United States as well as a "gentleman's agreement" between YKK and Scovill regarding customer allocation.  (*Id.* at ¶ 44(i).)  On March 15, 2001, members of the Prym, YKK, and Scovill Defendants discussed pricing and marketing strategy in the United States.  (*Id.* at ¶ 44(m).)  Further, Plaintiffs allege that an internal Prym document referenced a violation of the "Coats/Prym agreement" with respect to the marketing and sales of Fasteners in the United States and Mexico.  (*Id.* at ¶ 44(p).)

Plaintiffs' allegations, at least in part, are based on a European Commission ("EC") investigation and decision implicating some of the Defendants in the operation of European and global cartels.  (*Id.* at ¶ 53.)  On September 19, 2007, the EC issued a press release that announced the imposition of fines totaling 328.644 million euros on members of the Prym, YKK, Coats, and Scovill Defendants for their illegal activities.  (*Id.*)

In the next several months, thirty-five Plaintiffs filed complaints in four United States district courts alleging price-fixing conspiracies in the United States Fasteners market.  These actions were subsequently consolidated and brought before this Court for pretrial proceedings.

Pending before the Court are three Motions.  We will first address the issues raised in the Joint Motion to Dismiss. We will then consider the separate Motions to Dismiss for lack of

personal jurisdiction filed by YKK Corporation and Coats plc.

## II.   LEGAL STANDARDS

Under Federal Rule of Civil Procedure 8, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint that merely alleges entitlement to relief, without alleging facts that show entitlement, must be dismissed.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  This "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary elements."  *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

In a recent opinion reversing a district court's Rule 12(b)(6) dismissal, the Third Circuit expressly repudiated the notion that a heightened pleading standard applies in antitrust cases.  *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (citing 5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1221 (3d ed. 2004) (noting that Rule 8's pleading standard applies with the same degree of rigor "in every case, regardless of its size, complexity, or the number of parties that may be involved")).  The Court held that "it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in antitrust and other complex cases."  *Id.*

4

When a defendant raises a jurisdictional defense under Federal Rule of Civil Procedure 12(b)(2), the plaintiff must show contacts with the forum state that are sufficient to give the court personal jurisdiction over the defendant.  However, "the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor."  *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004); *see BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 259 (3d Cir. 2000).  Personal jurisdiction in federal antitrust litigation is evaluated "on the basis of a defendant's aggregate contacts with the United States as a whole."  *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 298 (3d Cir. 2004).

## III.   DISCUSSION

### A.     Statute of Limitations and Fraudulent Concealment

As an initial matter, Defendants YKK Corporation of America, YKK (U.S.A.), YKK Snap Fasteners America, Coats Holdings, Coats American, Coats North America de Republica Dominicana, Coats and Clark, and Scovill Fasteners ("Joint Defendants") argue that Plaintiffs' claims are time barred.  The Clayton Act provides that a private antitrust action must be commenced within four years after the cause of action accrued.  15 U.S.C. § 15b.  In a price-fixing case, a cause of action accrues and the statutory period begins anew every time defendants commit an overt act that is part of the violation and that injures the plaintiff.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).  Joint Defendants argue that Plaintiffs filed their various complaints in 2007, more than four years after the last cause of action accrued.  Plaintiffs anticipated this defense specifically alleging in their Complaint that the statute of limitations was tolled by Defendants' fraudulent concealment of the alleged conspiracy.  According to Plaintiffs, the statute of limitations was tolled until September 19, 2007, the date on which the purported

5

Fasteners conspiracy was revealed publicly in an EC press release.  (Consol. Class Action

Compl. ¶ 80.)

The equitable doctrine of fraudulent concealment is read into every federal statute of

limitations.  *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946); *In re Aspartame Antitrust Litig.*,

No. 06-1732, 2007 WL 5215231, at *3 (E.D. Pa. Jan. 18, 2007).  To sustain a fraudulent

concealment allegation in this Circuit, a plaintiff must establish three elements:  "(1) that the

defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the

validity of her claim within the limitations period; and (3) where the plaintiff's ignorance is not

attributable to her lack of reasonable diligence in attempting to uncover the relevant facts."  *Cetel*

*v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 509 (3d Cir. 2006).  Fraudulent concealment allegations

must be pleaded with particularity under Federal Rule of Civil Procedure 9(b).  *In re Elec.*

*Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 315 (D.N.J. 2004).  However, so as not to

allow "sophisticated defrauders to successfully conceal the details of their fraud . . . courts have

relaxed the rule when factual information is peculiarly within the defendant's knowledge or

control."  *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal

quotations and citations omitted).

### 1.    *Affirmative Act of Concealment*

The first element of fraudulent concealment generally requires a plaintiff to establish that

defendants did affirmative acts to conceal their wrongful conduct.  *In re Aspartame*, 2007 WL

5215231, at *4.  If a conspiracy is the underlying cause of action, courts have articulated three

different approaches for determining whether the affirmative act element is satisfied.  *Id.*  The

first and most difficult approach requires that plaintiff show that the defendants took "affirmative

6

steps in addition to the original wrongdoing to prevent the plaintiff from discovering the wrong."
*Colorado v. W. Paving Constr. Co.*, 630 F. Supp. 206, 210 (D. Colo. 1986), *aff'd en banc*, 841
F.2d 1025 (10th Cir. 1988).  Plaintiff must demonstrate an act of concealment that is extrinsic to
the conspiracy.  The second, "intermediate" approach, applied in the Fourth and Fifth Circuits
requires that "plaintiff must prove that the defendants affirmatively acted to conceal their
antitrust violations, but the plaintiff's proof may include acts of concealment involved in the
antitrust violation itself."  *Supermarket of Marlington, Inc. v. Mead Gold Dairies, Inc.*, 71 F.3d
119, 122, 125 (4th Cir. 1995); *see Texas v. Allan Const. Co.*, 851 F.2d 1526, 1532 (5th Cir.
1988).  Under the third approach, adopted by the Second Circuit, a plaintiff satisfies her burden
where the antitrust violation is self-concealing.  *New York v. Hendrickson Bros.*, 840 F.2d 1065,
1083-84 (2d Cir. 1988).  The Third Circuit has not specifically endorsed any of these approaches.

Joint Defendants argue that Plaintiffs must allege affirmative acts of concealment.  *In re
Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 242 F.3d 497, 502-03 (3d Cir. 2001)
(requiring affirmative independent act of concealment); *Bucci v. Wachovia Bank, N.A.*, 591 F.
Supp. 2d 773, 787 (E.D. Pa. 2008) (same).  We agree with Joint Defendants that if Plaintiffs are
required to articulate extrinsic acts of concealment, the allegations in the Complaint would fail.
The Complaint identifies two affirmative acts of concealment.  First, Plaintiffs allege that
Defendants gave "false and pretextual reasons for increases in the prices of Fasteners sold by
them during the Class Period, including falsely attributing such increases to increased raw
material component costs as well as exchange rates."  (Compl. ¶ 82.)  A district court in this
Circuit facing similar allegations about the defendants' public statements concluded that the
plaintiffs did not plead an extrinsic act with sufficient specificity.  *In re Aspartame*, 2007 WL

5215231, at *5 ("Plaintiffs do not state who made these statements, to whom they were made, when they were made, or what was said.  While the Court is cognizant that many of the purported conspiracy's details were known only to its members, the same is not true for statements allegedly made to the public.").  Second, Plaintiffs allege that during the spring and summer of 2003, the Prym and YKK Defendants met to discuss the EC's request for information.  According to Prym, Plaintiffs allege that "a general defense strategy was discussed and the participants agreed to deny everything."  (Compl. ¶ 82.)  Assuming that this allegation is true, it fails to advance Plaintiffs' argument.  The allegation refers to a joint defense strategy, which is confidential by its very nature.  Moreover, Joint Defendants' legal strategy in response to an EC inquiry addressing harm in Europe is not necessarily relevant to an alleged conspiracy directed at the United States.  If we applied either the strict or intermediate standard to Plaintiffs' fraudulent concealment allegation, Defendants would prevail.

A survey of district court cases reveals that, while there is some divergence, for the most part courts in this Circuit have applied the "self-concealing" standard to antitrust conspiracies. *Compare In re Aspartame*, 2007 WL 5215231, at *5-6 (applying self-concealing standard); *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, No. 02-6030, 2004 U.S. Dist. LEXIS 29586, at *10-11 (D.N.J. Oct. 26, 2004) (*Bulk I*) (same); *Pennsylvania v. Milk Indus. Mgmt. Corp.*, 812 F. Supp. 500, 504 (E.D. Pa. 1992) (same); *Bethlehem Steel Corp. v. Fischbach & Moore, Inc.*, 641 F. Supp. 271, 274 (E.D. Pa. 1986) (same); *In re Mercedes-Benz Anti-trust Litig.*, 157 F. Supp. 2d 355, 371 (D.N.J. 2001) (recognizing the self-concealing and intermediate standards), *with Pennsylvania v. Lake Asphalt & Petroleum Co. of Pa.*, 610 F. Supp. 885, 888 (M.D. Pa. 1985) (requiring an affirmative act independent of the alleged underlying conspiracy).

8

Where a plaintiff alleges a price-fixing conspiracy, the self-concealing standard is consistent with the principles of equitable tolling.  "It is immaterial to the unsuspecting plaintiff whether defendants have effectively concealed their illicit conduct through an elaborate and secret conspiracy or through affirmative acts of deceit."  *In re Aspartame*, 2007 WL 5215231, at *5.  The notion of a self-concealing conspiracy dates back to *Bailey v. Glover*, 88 U.S. 342, 349 (1874) ("To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure.").  *See also In re Mercedes*, 157 F. Supp. 2d at 370. Price-fixing conspiracies are inherently self-concealing.  *See, e.g.*, *In re Issuer Pl. Initial Pub. Offering Antitrust Litig.*, No. 00-7804, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004).  To reward co-conspirators for the successful perpetuation of their secrecy furthers no equitable objectives.

Plaintiffs allege that Defendants maintained their conspiracy through surreptitious meetings and communications.  Defendants' purported conspiracy would have been fruitless without a deliberate effort to conceal its substance.  *See In re Aspartame*, 2007 WL 5215231, at *6 ("Plaintiffs were unable, and thus not required, to provide the inner workings of the conspiracy because, according to the complaint, that information was deliberately concealed from plaintiffs and the public.").  We conclude that Plaintiffs have sufficiently alleged a self-concealing conspiracy, and have satisfied the first requirement of their fraudulent concealment argument.

  2.  *Due Diligence*

9

Next, Plaintiffs must demonstrate that they "neither knew, nor, in the existence of due diligence, could reasonably have known of the offense." *In re Aspartame*, 2007 WL 5215231, at *6 (citations omitted).  Determining the date on which a plaintiff discovered, or reasonably should have discovered, the purported wrongdoing is an inherently factual inquiry that is usually not ripe for resolution on a motion to dismiss. *See id.*; *Bulk I*, 2004 U.S. Dist. LEXIS 29586, at *14; *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 346-47 (S.D.N.Y. 2000).  We may only dismiss a complaint for lack of due diligence where the pleadings and public disclosures demonstrate "beyond doubt that plaintiff can prove no facts to support the claim." *In re Aspartame*, 2007 WL 5215231, at *6 (quoting *Bethlehem Steel*, 641 F. Supp. at 275).  Moreover, where an alleged conspiracy is self-concealing, a plaintiff must only exercise diligence when she is aware of "red flags" that definitively apprise plaintiff of the cause of action. *See id.* at *7.  To grant a motion to dismiss in this context, a defendant must "point to undisputed facts in the record which demonstrate conclusively that [plaintiff] had notice of [its] claims, and, that, had it exercised reasonable diligence, it would have discovered adequate grounds for filing this antitrust lawsuit during the limitations period." *Chemi SpA v. GlaxoSmithKline*, 356 F. Supp. 2d 495, 499 (E.D. Pa. 2005) (citations omitted).  "It is not enough . . . to point to facts which **might** have caused a plaintiff to inquire, or **could** have led to evidence supporting his claim." *Id.* (emphasis in original).  For example, in *Bulk I*, one of the defendants disclosed in its SEC Form 10-K filing that the Department of Justice had initiated an investigation into possible antitrust violations. 2004 U.S. Dist. LEXIS 29586, at *5.  The court found that such filings were insufficient to put a plaintiff on notice of the defendants' wrongdoing and therefore denied the defendants' motions to dismiss. *Id.* at *13-14.  The *In re Mercedes* court denied the defendants' motion to dismiss

where there was a prior lawsuit filed relating to the same misconduct.  157 F. Supp. 2d at 373.

Here, Plaintiffs argue that the statute of limitations should be tolled until September 19, 2007, the date on which the EC issued a press release announcing the imposition of fines on Defendants and others.  Plaintiffs argue that they could not have learned about the conspiracy at an earlier date because of the stealth practices Defendants utilized to conceal their wrongdoing. Joint Defendants argue that Plaintiffs should have been aware of their potential claim as early as 2001.  In support of this position, Joint Defendants cite various public articles and reports. (Defs.' Joint Mot. Dismiss Ex. 4 at 7 (2001 Coats plc Annual Report confirming EC investigation into haberdashery and thread products); *Id.* Ex. 5 (November 9, 2001 Coats plc press release confirming EC investigation); *Id.* Ex. 6 (November 9, 2001 article in The Independent confirming EC raid on Coats); *Id.* Ex. 7 (November 9, 2001 article in The Times (London) confirming EC raid on Coats); *Id.* Ex. 8 (November 9, 2001 article on Sharecast.com confirming EC raid on Coats); *Id.* Ex. 9 at 6 (March 6, 2002 Coats financial report confirming the EC investigation); *Id.* Ex. 11 (October 26, 2004 EC press release announcing imposition of 60 million euro fines on Coats and Prym for a cartel in the needle market and other haberdashery products); *Id.* Ex. 12 (October 26, 2004 Associated Press article confirming fines imposed on Coats and Prym).)  Defendants argue that these earlier public documents should have raised Plaintiffs' suspicions to the same extent as the September 2007 EC press release.  Furthermore, Defendants argue that Plaintiffs' failure to allege any acts of reasonable diligence is fatal to their claim.

Joint Defendants have identified a significant number of public documents that could have provided Plaintiffs with constructive or actual notice of the alleged conspiracy.

Nevertheless we are satisfied that the determination of diligence is more appropriate after the factual record is developed.  While Joint Defendants cite documents and articles acknowledging an EC investigation into the Coats and Prym Defendants as early as 2001, Plaintiffs assert that they had no direct knowledge of this investigation and were unaware of any wrongdoing until the EC distributed a press release on September 19, 2007.  In other words, Joint Defendants have not identified any red flags that would have "definitively alerted" Plaintiffs to the cause of action during the limitations period.  *See In re Aspartame*, 2007 WL 5215231, at *7.

The extent of Plaintiffs' exposure to newspaper articles involves a factual inquiry.  A determination of whether these documents constituted sufficient "red flags" so as to put Plaintiffs on notice must await a more complete record.  The factual nature of the inquiry involves an evaluation of Plaintiffs' exposure to these articles, the circulation of various publications, and the likelihood that a reasonable plaintiff would have read such documents.  *See O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1152-53 (9th Cir. 2002).  A determination at this juncture that Plaintiffs, as a matter of law, had notice of the referenced public documents, many of which derive from European sources, is premature.

Joint Defendants also misconstrue the controlling legal standard to the extent that they argue that Plaintiffs "must plead specific acts of diligence for a claim of fraudulent concealment to survive dismissal."  (Defs.' Reply in Supp. of Joint Mot. Dismiss 14, ECF No. 82.)  "Plaintiffs bear the burden only to show that the cause of action would not have been revealed even in the exercise of diligence, not that affirmative investigative steps were taken to identify the conspiracy."  *In re Aspartame*, 2007 WL 5215231, at *7; *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1475705, at *4 (D.D.C. May 9, 2000) (citing *Klehr v. A.O. Smith Corp.*, 521 U.S.

179, 195 (1997) ("[T]he concealment requirement is satisfied only if the plaintiff shows that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense.")).  Plaintiffs were not required to plead specific investigative measures.

We are satisfied that Plaintiffs have adequately stated a claim for fraudulent concealment. Ultimately, Plaintiffs will have to prove their allegations in order to toll the statute of limitations. At this juncture, however, accepting Plaintiffs' allegations as true, we will deny Joint Defendants' argument that Plaintiffs' claims are time barred.

### B.       Conspiracy Allegations

To state a claim under Section 1 of the Sherman Act, a plaintiff must allege four elements:  1) concerted action by the defendants; 2) that produced anti-competitive effects within the relevant product and geographic markets; 3) that the concerted actions were illegal; and 4) that it was injured as a proximate result of the concerted action.  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010).  A plaintiff must plead factual allegations that "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555. "[R]egardless of whether the plaintiff expects to prove the existence of a conspiracy directly or circumstantially, it must plead 'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 325 (3d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).

Joint Defendants argue that Plaintiffs fail to show how evidence of wrongdoing by parties investigated by the EC establishes any wrongdoing by Defendants with respect to the products they sell in the United States.  Joint Defendants' assertion is premised on the assumption that Plaintiffs are simply asking the Court to infer that "if it happened there [Europe], it could have

13

happened here [United States]." *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir.

2007).  However, this is not a situation, as Joint Defendants suggest, where Plaintiffs have

"simply 'cut-and-pasted' into their complaint the collusive activities found by the EC to have

taken place in Europe and tacked on 'in the United States and elsewhere.'" *In re ACR Copper

Tubing Litig.*, No. 06-2207, slip op. at 6 (W.D. Tenn. July 26, 2007).  Plaintiffs have made

specific allegations, many of which contain names and dates, describing how Joint Defendants'

conspiracy targeted and affected the United States.  For instance, Plaintiffs cite a July 15, 1998

meeting in which management from Prym, including CEO Axel Prym, and Coats discussed

zipper sales in the American market and their desire to avoid price competition.  (*See* Compl.

¶ 44(b).)  On August 13, 1999, executives from Prym and YKK discussed global cooperation

between YKK and Prym, as well as a worldwide minimum price provision, which presumably

included the United States.  (*Id.* at ¶ 44(f).)  On February 7, 2000, senior management of Prym

and YKK specifically agreed to future price increases in North America.  (*Id.* at ¶ 44(h).)  On

February 13, 2000, Axel Prym met in Japan with YKK management and discussed problems

related to a United States customer.  They also discussed a "gentleman's agreement" between

YKK and Scovill regarding allocation of customers.  (*Id.* at ¶ 44(i).)  On December 14, 2000,

YKK and Prym agreed on a minimum price for Fasteners.  The participants set specific prices for

individual countries and a separate minimum price for the rest of the world, which included the

United States.  (*Id.* at ¶ 44(j).)  On February 7, 2001, Axel Prym met with Martin Flower, who

held various positions at Coats plc, including board member and CEO.  (*Id.* at ¶ 44(l).)  They

discussed methods to achieve further growth in the United States market.  (*Id.*)  On March 15,

2001, management from Prym, YKK, and Scovill convened in Germany.  (*Id.* at ¶ 44(m).)

14

Scovill disclosed its pricing and marketing strategy in the United States.  (*Id.*)  In an email sent

on May 25, 2001, a managing director of Prym Fashion, in the United States, wrote that:

> for the last 2 years I've been enjoying fruitful exchanges of information (contact
> names, background of target customers) with Coats America.  In view of this
> mutually positive experience, Coats would like to expand this kind of cooperation
> also for Europe.  To this end, Coats headquarters in Glasgow has appointed Mr.
> Ronald MacNiven to the position of Director European Key Accounts.

(*Id.* at ¶ 44(o).)  Plaintiffs further allege that an internal Prym document drafted in the early

2000s referenced a violation of a Coats-Prym agreement with respect to the marketing and sale of

Fasteners in the United States and Mexico.  (*Id.* at ¶ 44(p).)  On June 11, 2002, Axel Prym met

with executives from YKK, during which, YKK complained about the price and other aspects of

Prym's rental of attaching machines to a United States customer.  They also discussed

purportedly confidential worldwide and United States sales estimates, YKK's United States

zipper market share, and their respective return on invested capital goods.  (*Id.* at ¶ 44(q).)  On

October 15, 2002, Axel Prym again met with representatives from YKK and discussed a proposal

under which Prym and YKK would serve as the "price leader" for Fastener products or attaching

machines for certain customers in different parts of the world, including the United States.  (*Id.* at

¶ 44(s).)  On January 13, 2003, in a meeting between YKK and Axel Prym, YKK proposed the

development of a worldwide price matrix.  (*Id.* at ¶ 44(s).)

Plaintiffs are not merely relying on the EC decision regarding Defendants' conduct in

Europe.  Plaintiffs have alleged facts that are more than sufficient "to raise a reasonable

expectation that discovery will reveal" direct evidence implicating Defendants in a conspiracy

affecting and targeting the United States.  *Twombly*, 550 U.S. at 556.

Joint Defendants argue that Plaintiffs fail to adequately allege that Defendants conspired

with one another.  Joint Defendants assert that the Complaint is deficient because it does not

individually identify each Defendant in each allegation and it does not allege that each Defendant

explicitly colluded with every other Defendant.  For example, Joint Defendants argue that there

are no allegations of any meetings between any employees of Scovill and Coats.  Joint

Defendants maintain that Plaintiffs' allegations, many of which describe bilateral meetings, fail

to support an inference that Defendants engaged in the single, broad, overarching conspiracy that

Plaintiffs allege.  In addition, Joint Defendants argue that the EC Decision, which investigated

four separate conspiracies in Europe, undermines Plaintiffs' theory that Defendants engaged in a

single conspiracy affecting the United States.  Joint Defendants essentially argue that Plaintiffs'

allegations, which allude to interconnected events and shared participants, do not demonstrate a

"conscious commitment to a common scheme."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465

U.S. 752, 764 (1984) (citations omitted).

        While Plaintiffs are "required to allege facts sufficient to put each Defendant on notice of

the claims against them, it is sufficient to allege 'that all of the named defendants were

participants in the conspiracy.'"  *Bulk I*, 2004 U.S. Dist. LEXIS 29586, at *27 (citations omitted).

At this stage in the litigation, the law does not require Plaintiffs to allege with particularity

precisely how each Defendant participated in the conspiracy.  *Id.* at *28; *see also In re OSB*

*Antitrust Litig.*, No. 06-826, 2007 WL 2253419, at *5 (E.D. Pa. Aug. 3, 2007) ("Antitrust

conspiracy allegations need not be detailed defendant by defendant.").  Rather, "an antitrust

complaint should be viewed as a whole, and the plaintiff must allege that each individual

defendant joined the conspiracy and played some role in it."  *In re OSB*, 2007 WL 2253419, at

*5.  Arguments similar to those made by Joint Defendants have been made by corporate

16

defendants in other cases and have been routinely rejected.  *See, e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) ("Defendants' arguments fail because they rely upon the standard for a motion for summary judgment. Although Plaintiffs will need to provide evidence of each Defendants' participation in any conspiracy, at this point they need only make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."); *Bulk I*, 2004 U.S. Dist. LEXIS 29586, at *28 ("Plaintiffs cannot be expected to know details of [defendants'] meetings and other arrangements before discovery."); *In re Nasdaq Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 712 (S.D.N.Y. 1995) ("Plaintiffs in this District have not been required to specify individual acts of each defendant in an antitrust conspiracy allegation.").

Plaintiffs cite numerous meetings and communications in which various Defendants purportedly discussed price-fixing arrangements.  Even though many of the allegations involve bilateral communications between Prym and other Defendants, Plaintiffs assert that there was one overarching conspiracy among all Defendants.  We reject Joint Defendant's argument that Plaintiffs have carefully obfuscated the lack of connection among the different alleged meetings. Plaintiffs articulate facts that plausibly suggest a unity of purpose among Defendants.  The law does not require Plaintiffs to allege that each Defendant participated in every facet of the conspiracy in order to establish liability.  Joint Defendants' argument that there are "no allegations that all Defendants together agreed to fix prices for all 'Fasteners' at any of the meetings" is unpersuasive.  (*See* Defs.' Reply in Supp. of Joint Mot. Dismiss 26.)  Plaintiffs are not required to allege the exact nature of the agreements and the extent to which each conspirator furthered the conspiracy's objectives prior to discovery.  We are satisfied that Plaintiffs have

17

sufficiently alleged the existence of a conspiracy among Defendants.

Joint Defendants argue that Plaintiffs have conflated different products under the umbrella term "Fasteners" and have failed to allege any plausible product market.  They argue that Plaintiffs have not satisfied their burden in demonstrating why different products, such as zippers, snap fasteners and buttons, should be included in the same Fasteners product market. Joint Defendants also argue that Plaintiffs' allegations with regards to zippers are inadequate and cannot survive a motion to dismiss.  Joint Defendants' reliance on *In re Bath and Kitchen Fixtures Antitrust Litigation*, No. 05-510, 2006 WL 2038605 (E.D. Pa. July 19, 2006), is misplaced.  In *In re Bath,* the plaintiffs' complaint, which devoted only two paragraphs to describing the alleged antitrust violations, was "devoid of even a minimal factual background." *Id.* at *3.  The court found that if it allowed the case to go forward, "the defendants would be forced to defend against a large scale class action with no notice of what they allegedly did wrong beyond the general claim that they agreed to fix the prices of a large amount of products and carried out that agreement."  *Id.* at *4.  In the instant case, Plaintiffs' factual allegations provide sufficient notice to Joint Defendants of the claims being made against them.  Plaintiffs are not required to spell out the precise boundaries of the Fasteners product market prior to discovery.  Plaintiffs sufficiently allege that each Defendant contributed to, and participated in, one conspiracy to fix prices in the Fasteners market, which includes zippers.

Joint Defendants argue that Plaintiffs fail to allege any plausible antitrust violations that occurred before 1998 or after 2003.  Joint Defendants argue that the first alleged meeting that "directly impacted United States prices" was in 1998.  (Defs.' Joint Mot. Dismiss 30.) Moreover, Joint Defendants assert that the last alleged meeting of any kind occurred in 2003,

four years before Plaintiffs filed their Complaint.

Plaintiffs respond that the Class Period begins in 1991, when senior management of the Prym, Scovill, and YKK Defendants convened in three "work circles"—Baseler, Wuppertaler and Amsterdamer—under the auspices of a German trade association.  (Compl. ¶¶ 45-46.) Plaintiffs assert that during these meetings Defendants attempted to distort competition. Plaintiffs concede that Defendants did not focus on the United States as the primary target of their conspiracy in the early years of the Class Period.  (*See id.* at ¶ 49 ("In the Wuppertaler circle, the focus was on matters relating to the German market, although price increases for exports to non-German markets were also discussed, whereas in the Baseler and the Amsterdamer circles the focus was on Europe-wide matters.").)  Plaintiffs allege, however, that while:

> the general focus of these meetings was on markets outside the United States, millions of dollars of Defendants' Fasteners were imported into the United States during the Class Period from Germany and other countries within the European Union, and elsewhere, where, they were purchased by Class members at supra-competitive prices, thereby directly affecting the United States market.

(*Id.* at ¶ 50.)  Plaintiffs buttress their position with a description of the characteristics of the United States Fasteners market.  They allege that the market is highly concentrated and that there are few substitutes for Fasteners, industry attributes which facilitate collusion.  Plaintiffs also allege that while demand for Fasteners has been in significant decline since at least 1995, prices have remained at similar levels or even increased.  According to Plaintiffs, these market attributes and trends are probative of collusive activity among Defendants.

Plaintiffs allege that the last known communicative activity among Defendants occurred on July 10, 2003, when the Prym and YKK Defendants met to discuss the EC's request for

information pursuant to its pending investigation.  Plaintiffs allege that during this meeting "a general defense strategy was discussed and the participants agreed to deny everything."  (Compl. ¶ 82.)  Furthermore, Plaintiffs allege that no Defendant ever withdrew from the conspiracy. Based on these allegations, Plaintiffs argue that the conspiracy continued for four more years, until September 19, 2007, the day on which the EC announced in a press release its imposition of fines on various Defendants and others.

We are satisfied that Plaintiffs plausibly allege a conspiracy that extended throughout the duration of the purported Class Period.  The Complaint mentions specific times, places, and persons involved in the alleged conspiracy from 1991 through 2007.  These allegations comply with the notice pleading requirements of the Federal Rules of Civil Procedure.  We are not confronted with a situation in which the "time period for the conspiracy is generally stated" or where Plaintiffs "give no explanation of where or when during this multiple-year time frame any unlawful agreements or understandings might have occurred."  *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008).  Nor is this Complaint so wanting in specificity regarding the Class Period that a defendant seeking to respond "would have little idea where to begin."  *See Twombly*, 550 U.S. at 565 n.10.

Joint Defendants fail to provide authority, and we are aware of none, in which a a court has shortened the plaintiffs' proposed class period at the motion to dismiss stage.  The authorities upon which Joint Defendants rely are inapposite.  In all three of the cases cited, the courts dismissed the entire complaint, finding that the plaintiffs' generic allegations fell short of the pleading threshold.  *See id.* ("Apart from identifying a seven-year span in which the § 1 violations were supposed to have occurred (*i.e.*, '[b]eginning at least as early as February 6,

1996, and continuing to the present,' . . . ), the pleadings mentioned no specific time, place or person involved in the alleged conspiracies."); *Total Benefits*, 552 F.3d at 436-37 (relying on *Twombly* to dismiss a complaint that "generally stated" the time period without any reference to the "who, what, where, when, how or why"); *In re Bath & Kitchen Fixtures*, 2006 WL 2038605, at *5 ("[E]xcept for alleging that the agreement to fix prices was carried out over an approximately four year time period, [the complaint] makes no claims as to when the defendants actually formed the conspiracy.").

We are satisfied that any adjustment to the class period at this juncture would be inappropriate.

### C.      Personal Jurisdiction Over YKK Corporation and Coats plc

Defendants Coats plc and YKK Corporation have each separately moved to dismiss the Complaint based upon a lack of personal jurisdiction.

Plaintiffs bear the burden of articulating facts sufficient to establish jurisdiction over Defendants. *See Miller Yacht Sales*, 384 F.3d at 97.  If the court "does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Id.*  In contrast to Rule 12(b)(6), when a defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the court's review is not limited to the pleadings. *Patterson by Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990).  If the defendant submits evidence disputing the allegations in the complaint, the plaintiff must present evidence in support of personal jurisdiction. *Id.* at 604 ("[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack

of in personam jurisdiction.").

Under *International Shoe* and its progeny, we may exercise personal jurisdiction over a nonresident defendant when that defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted).  Personal jurisdiction in federal antitrust litigation is evaluated "on the basis of a defendant's aggregate contacts with the United States as a whole." *In re Auto. Refinishing*, 358 F.3d at 298.

General jurisdiction over a defendant may exist where the plaintiff's claims do not arise from the defendant's contacts with the forum.  General jurisdiction requires the plaintiff to show that the nonresident defendant has "continuous and systematic" contacts with the forum. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984).

Specific jurisdiction over a defendant exists when the cause of action "arises out of" the defendant's contacts with the forum.  *Id.* at 414 & n.8.  In the specific jurisdiction analysis, we must determine whether the "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  Such contacts must be based on "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

Where the plaintiff's claim is based on intentional torts that have an effect in the forum, the minimum contacts requirement may be satisfied under the "effects test." *Calder v. Jones*, 465 U.S. 783, 789 (1984); *see IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 260 (3d Cir. 1998)

("Generally speaking, under *Calder* an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts with the forum such that the 'minimum contacts' prong of the Due Process test is satisfied.").  To satisfy the effects test, Plaintiffs must establish:  1) that the defendant committed an intentional tort; 2) that the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and 3) that the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.  *IMO Indus.*, 155 F.3d at 265-66.  The effects test is generally applied in cases involving business torts, including price-fixing.  *See, e.g.*, *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207-08 (2d Cir. 2003); *In re Bulk [Extruded] Graphite Prods. Antitrust Litig.*, No. 02-6030, 2007 U.S. Dist. LEXIS 54906, at *13-14 (D.N.J. July 30, 2007) ("*Bulk II*").

### 1. YKK Corporation

Plaintiffs argue that the effects test establishes personal jurisdiction over YKK Corporation.  YKK Corporation is a Japanese company that owns 100 percent of the stock of Defendants YKK Corporation of America, YKK (U.S.A.), and YKK Snap Fasteners America.  YKK Corporation has never manufactured zippers or other products in the United States and has never been registered to do any business in any state in the United States.  YKK Corporation is not listed on any United States stock exchange.  YKK Corporation offers sworn affidavits declaring that it does not dominate or control its wholly-owned subsidiaries in the United States.  (YKK Corp.'s Mot. Dismiss Exs. 4, 5.)

Plaintiffs argue that personal jurisdiction is appropriate because YKK Corporation

committed an intentional antitrust tort, which had domestic effects.  Plaintiffs allege that YKK

Corporation's senior management actively participated in a "Fasteners" conspiracy.  For

example, on August 13, 1999, Nishio and Tsubokawa of YKK Corporation met with Axel Prym,

the CEO of Prym.  (Compl. ¶ 44(f).)  YKK Corporation does not dispute that Tsubokawa is a

YKK Corporation executive.  (YKK Corp.'s Reply 20-21, ECF No. 84.)  During this meeting,

they discussed a worldwide minimum price provision, which presumably includes the United

States.  (Compl. ¶ 44(f).)  At a February 7, 2000 meeting between Tsubokawa and Axel Prym,

they discussed future price increases in North America.  (*Id.* at ¶ 44(h).)  On February 13, 2000,

Tsubokawa and Inoue of YKK Corporation again met with Axel Prym.  (*Id.* at ¶ 44(i).)  YKK

Corporation does not contest that Inoue is a YKK Corporation executive.  (YKK Corp.'s Reply

20-21.)  They allegedly discussed the sales of Fasteners in the United States, problems related to

a United States customer, and a "gentleman's agreement" between YKK and Scovill regarding

the allocation of customers.  (Compl. ¶ 44(i).)  On June 11, 2002, Tsubokawa complained to

Axel Prym about the price and other aspects of Prym's rental of attaching machines to a United

States customer.  (*Id.* at ¶ 44(q).)  They also discussed worldwide and United States sales

estimates, zipper market shares, and their return on invested capital goals.  (*Id.*)

    YKK Corporation argues that Plaintiffs' evidence does not demonstrate that the United

States was the focal point of Defendants' illegal activities.  The effects test was created for

business torts and it is difficult to apply it strictly in the international antitrust context.  *See Bulk

II*, 2007 U.S. Dist. LEXIS 54906, at *26.  However, the "special character of an antitrust claim

leads the Court to interpret more liberally" the effects test's requirement that defendants aim the

tortious conduct at the forum.  *Id.*  Viewed cumulatively, Plaintiffs have set forth a prima facie

24

showing of specific jurisdiction.  Plaintiffs' allegations, which are premised in part on the EC

Decision, suggest that Defendants' collusive activities affected consumers on an international

level.  The Complaint, however, focuses on YKK Corporation's participation in a conspiracy that

was expressly aimed at the United States.  Plaintiffs allege that they paid artificially inflated

prices for Fasteners as a result of Defendants' conspiracy.  In addition, the jurisdictional inquiry

here clearly implicates the merits of the case.  Under these circumstances, "any final

determination as to the question of personal jurisdiction is best deferred until after the parties

have presented the fully array of evidence."  *Id.* (citing 5B Charles A. Wright & Arthur R. Miller,

*Federal Practice & Procedure* § 1351 (3d ed. 2004)).

Since Plaintiffs have sufficiently alleged that the Court has specific jurisdiction over

YKK Corporation under the effects test, we need not consider Plaintiffs' argument that the Court

also has general jurisdiction over YKK Corporation.  Exercising personal jurisdiction over YKK

Corporation will not offend traditional notions of fair play and substantial justice.  *See Int'l Shoe*,

326 U.S. at 316.

We will therefore deny YKK Corporation's Motion to Dismiss for lack of personal

jurisdiction.

### 2.     *Coats plc*

Plaintiffs advance four legal theories for asserting personal jurisdiction over Coats plc:

1) specific jurisdiction under the effects test; 2) specific jurisdiction under the co-conspirator

theory; 3) general jurisdiction under the alter-ego doctrine; and 4) general jurisdiction based on

Coats plc's continuous and systematic contacts with the United States.

Coats plc is a holding company organized under the laws of the United Kingdom.  Coats

plc owns 100 percent of the stock of Defendants Coats Holdings, Inc., Coats American, Inc., Coats North America de Republica Dominicana, and Coats and Clark, Inc.  (Coats plc's Mot. Dismiss Ex. 1.)  Coats plc has never been licensed to conduct any business in the United States. It has never manufactured, marketed, promoted, advertised, distributed, or sold any goods or products in the United States.  (*Id.*)  Coats plc has no officers, agents, places of business, or any real or personal property in the United States.  Roger Bevan, the Secretary and Chief Financial Officer of Coats plc, asserts in his affidavit that Coats plc does not control the day-to-day operations of its subsidiaries.  (*Id.*)

Plaintiffs and Coats plc dispute the genesis of Coats plc.  The determination of Coats plc's labyrinthian corporate history is a material issue.  It dictates whether we may properly ascribe various contacts alleged in the Complaint to Coats plc.  Indeed, Coats plc disavows any relationship with the persons designated as employees of Coats plc in the Complaint.  In resolving this matter we are not confined to the pleadings.  *Patterson*, 893 F.2d at 603-04.

Plaintiffs argue that Coats plc was known as Coats Paton Ltd from 1961 through 1986, after which, it changed its name to Coats Viyella plc.  (Pls.' Opp'n to Coats plc's Mot. Dismiss 1 n.2, ECF No. 74.)  This position is partially supported by the EC Decision.  (Joint Mot. Dismiss Ex. 2 at 6.)  In 2001, the business entity changed its name to Coats plc.  (Coats plc 2001 Annual Report, Pls.' Opp'n to Coats plc's Mot. Dismiss Ex 1. at 4) ("The change of the Group's name, in May last year, to Coats plc—the historic brand name of our thread business—effectively summarised the Group's restructuring begun the previous autumn.")  Plaintiffs argue that in 2003, the entity became known as Coats Ltd and then Coats Holdings, Ltd.  (Pls.' Opp'n to Coats plc's Mot. Dismiss 1 n.2.)  In support of this position, Plaintiffs cite the Coats Ltd 2003 Annual

Report and the Coats plc 2004 Annual Report.  The 2003 Annual Report states in relevant part:

> 2003 was a year of substantial change in both the corporate and operating structure of the Group.  Following the unconditional recommended cash offer on 7 April, the acquisition of the ordinary shares of the Company by Coats Holdings plc (formerly Avenue Acquisition plc) was completed on 20 June. We subsequently received permission to re-register the Group as a private company, Coats Ltd, whilst maintaining the listing of our preference shares.

(Coats Ltd 2003 Annual Report, Pls.' Opp'n to Coats plc's Mot. Dismiss Ex. 2 at 1.)  The 2004

Annual Report reflects the adoption of a new name.  The Report states:

> The Company became a subsidiary of Guinness Peat Group plc on 1 April 2004 and subsequently changed its name from Coats Holdings plc to Coats plc.  The operations of the Group comprise almost entirely the operations of Coats Holdings Ltd, previously named Coats Ltd, which was acquired on 7 April 2003.

(Coats plc 2004 Annual Report, Pls.' Opp'n to Coats plc's Mot. Dismiss Ex. 3 at 1.)  Since 2004,

Coats has prepared and disseminated annual reports on its website as Coats plc.  Plaintiffs argue

that their allegations against "Coats plc" refer to Coats plc and its predecessors described herein.

Coats plc offers the affidavit of Roger Bevan to contest Plaintiffs' interpretation of Coats

plc's corporate history.  According to Bevan:

> Coats plc is the successor in name, as of 1 July 2004, to "Coats Holdings plc." Coats Holdings plc, in turn, was formerly known as "Avenue Acquisition plc," from which it changed its name on 28 May 2003.  Prior to 27 January 2003, Avenue Acquisition plc had been named "GPG Avenue plc."  This is as far back as Coats plc's corporate history goes.  There are no other predecessors to Coats plc and no other names by which Coats plc has ever been known.  Coats plc has never been known as either "Coats Patons Ltd." or "Coats Viyella plc."  The entity that is now Coats plc did not exist prior to 18 December 2002.

(Coats plc's Reply Mem. Ex. 1 at ¶ 5, ECF No. 81.)  Bevan advises that the Coats plc referred to

in the 2001 Annual Report is a different corporate entity from the Coats plc that exists today:

> Plaintiffs' Exhibit 1 is an excerpt from the 2001 annual report of an entity which, at that time, had been called "Coats plc," but which is not the same entity that is now

27

Coats plc.  Indeed, Plaintiffs themselves recognize this in Footnote 2, as they observe
that the entity that was named "Coats plc" in 2001 later changed its name.  As noted
above, the present-day Coats plc is the successor in name as of 2004 to Coats
Holdings plc, and before that, Avenue Acquisition plc and GPG Avenue plc.  The
present-day Coats plc did not exist by that name in 2001 and is a different corporate
entity from the company that was called Coats plc in 2001.

(*Id.* at ¶ 7.)

Upon learning that Coats plc was taking the position that Plaintiffs had sued the wrong

party, Plaintiffs submitted a Sur-Reply requesting that the Court permit limited jurisdictional

discovery with respect to this issue.  (Pls.' Sur-Reply, ECF No. 87.)  Plaintiffs advise that after

Coats plc filed its Reply, Plaintiffs attempted to resolve this issue with Coats plc informally.

Plaintiffs requested information concerning Coats plc's corporate history and informed Coats

plc's counsel that following additional research, Plaintiffs believed that Coats Holdings, Ltd may

be a proper defendant either in lieu of, or in addition to, Coats plc.  Plaintiffs' counsel asked

Coats plc's counsel whether it would confirm that Coats Holdings, Ltd was in fact the successor

to the entity formerly known as Coats plc and whether Coats plc would agree to its inclusion in

the lawsuit.  On December 20, 2010, Coats plc's counsel emailed Plaintiffs' counsel stating

"[w]e do not have authority to agree to the substitution of another Coats entity for Coats plc."

(*Id.* at 5.)

If Coats plc's version of its corporate history is correct, several of Plaintiffs' theories of

personal jurisdiction over Coats plc are problematic.  These theories are premised upon the

proposition that Coats plc is the successor entity to Coats Paton Ltd and Coats Viyella plc.  With

respect to the effects test theory, many of the allegations in the Complaint that purport to connect

Coats plc to the conspiracy targeting the United States involve a participant named Martin

Flower.  Plaintiffs allege that Flower met with Axel Prym twice to exchange information and discuss the United States Fasteners market.  (Compl. ¶ 44(b), 44(l); Pls.' Opp'n to Def. Coats plc's Mot. Dismiss 9-10.)  Plaintiffs allege that on July 15, 1998, Flower and Prym specifically discussed price competition between the two companies and exchanged detailed information about their respective worldwide Fasteners businesses.  (Compl. ¶ 44(b).)  Plaintiffs also allege that the parties discussed the sales of zippers in the American market.  On February 7, 2001, Flower again met with Prym.  (*Id.* at ¶ 44(l).)  During this meeting, the parties discussed the United States market, including methods to achieve further growth, and their respective gross margins.

Plaintiffs allege that Flower was the CEO of Coats plc as of March 7, 2001.  (Pls.' Opp'n to Coats plc's Mot. Dismiss 9.)  The 1999 Annual Report of Coats Viyella, which Plaintiffs argue is the predecessor of Coats plc, states that Flower was appointed to "Chief Executive of the Coats Division" in 1988 and became a board member of Coats Viyella plc in 1990.  (*Id.* Ex. 5.)  Moreover, Flower wrote the "Chairman's statement" in the 2003 Annual Report of Coats Ltd, the purported successor to the 2001 Coats plc.  (*Id.*  Ex. 2.)

In his affidavit, Bevan states that Plaintiffs erroneously attribute their allegations concerning Flower to Coats plc.  Bevan contends that although Flower was the CEO of Coats plc in 2001, that entity was a separate corporate entity and not a predecessor of the present day Coats plc.  (Coats plc's Reply Mem. Ex. 1 at ¶ 14.)

The determination of whether Plaintiffs sufficiently allege personal jurisdiction under the effects test requires a correct understanding of Coats plc's corporate history.  Moreover, jurisdiction based upon the co-conspirator theory is also tied to this issue.  The co-conspirator

theory of personal jurisdiction is based on a May 25, 2001, email sent by a Prym managing

director.  (Pls.' Opp'n to Coats plc's Mot. Dismiss 12-14.)  Coats plc contends that it did not

even exist prior to December 18, 2002.  (Coats plc's Reply Mem. Ex. 1 at ¶ 5.)  In addition,

jurisdiction based on Coats plc's continuous and systematic contacts with the United States

depends upon a determination of Coats plc's history; all of Coats plc's alleged contacts with the

United States occurred prior to December 18, 2002.[4]  (Pls.' Opp'n to Coats plc's Mot. Dismiss

24-27.)

Finally, Plaintiffs argue that personal jurisdiction exists over Coats plc under the alter ego

theory.  Some of Plaintiffs' evidence in support of this position is attributable to the current

version of Coats plc, while other evidence relates to the Coats plc that Bevan advises is separate

and distinct from the Coats plc before the Court.  For example, Plaintiffs rely on excerpts from

Coats Viyella's 1999 and 2000 Annual Reports, Coats plc's 2001 Annual Report, Coats Ltd's

2003 Annual Report, and Coats plc's 2004 Annual Report.  (Pls.' Opp'n to Coats plc's Mot.

Dismiss 14-24.)  Plaintiffs argue that they allege a prima facie case of alter ego jurisdiction, even

if we ignore the evidence attributed to the "old" Coats plc and only focus on evidence relating to

the "new" Coats plc.  (Pls.' Sur-Reply 7.)  We find it prudent to defer our decision on the alter

ego theory until after Plaintiffs have engaged in limited jurisdictional discovery.  This will

provide Plaintiffs with an opportunity to determine the relevant facts that support jurisdiction.

Plaintiffs are entitled to jurisdictional discovery because their claims are not "clearly

frivolous."  *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003); *see In re*

---

[4] Plaintiffs identify acquisitions and divestitures that occurred in 1991, 1994, 1995, and
2001.  (Pls.' Opp'n to Coats plc's Mot. Dismiss 25.)  Plaintiffs also point to patents issued to
Coats plc in 1991, 1993, and 1998.  (*Id.* at 26-27.)

*Auto. Refinishing*, 2002 WL 31261330, at *5 ("Before dismissing a case for lack of personal

jurisdiction, courts should generally permit discovery into jurisdictional facts.") (citing cases).

Plaintiffs sufficiently allege contacts in the United States that may be attributed to Defendant

Coats plc and its predecessors.  While it is clear that there have been at least two iterations of

Coats plc, the connection between the Coats plc of 2001, in which Flower was the CEO, and the

present day Coats plc, remains to be seen.  Plaintiffs may conduct jurisdictional discovery to

determine whether Defendant Coats plc had sufficient contacts with the United States such that it

purposefully availed itself of the privilege of conducting activities within the forum.  In addition,

Plaintiffs are permitted to take limited discovery for the purpose of identifying other proper Coats

entities as defendants in this suit.  Following this period of limited discovery, Plaintiffs may

move to amend their Complaint to include additional defendants pursuant to Federal Rule of

Civil Procedure 15(c).[5]  *See Krupski v. Costa Crociere S. p. A.*, 130 S. Ct. 2485 (2010)

(discussing analysis for when an amendment to a pleading relates back to the date of the original

---

[5] Federal Rule of Civil Procedure 15(c) states, in relevant part:

(1) An amendment to a pleading relates back to the date of the original pleading
when:
> (C) the amendment changes the party or the naming of the party against
> whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the
> period provided by Rule 4(m) for serving the summons and complaint, the
> party to be brought in by amendment:
>> (ii) knew or should have known that the action would have been
>> brought against it, but for a mistake concerning the proper party's
>> identity.

Plaintiffs indicate in their Sur-Reply that following discovery, they may add Coats Holdings, Ltd
as a defendant.  (Pls.' Sur-Reply 2 n.1.)  Plaintiffs argue that under these circumstances such an
amendment would relate back to the filing of the Complaint for purposes of the statute of
limitations.  We will address this argument after we have been fully briefed on the issue.

pleading).

## IV.   CONCLUSION

For all of these reasons, Defendants' Joint Motion to Dismiss and YKK Corporation's Motion to Dismiss for lack of personal jurisdiction will be denied.  Coats plc's Motion to Dismiss for lack of personal jurisdiction will be addressed after Plaintiffs have conducted jurisdictional discovery.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**