IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE FASTENERS ANTITRUST | : | |
| LITIGATION | : | CIVIL ACTION |
| | : | |
| | : | NO. 08-md-1912 |

**SURRICK, J.**                                    **JANUARY  27 ,2014**

<u>**MEMORANDUM**</u>

Presently before the Court is Co-Lead Counsel's Joint Petition for Award of Counsel

Fees, Payment of Costs and Expenses, and Award of Incentive Payments to the Class

Representatives (ECF No. 129).  For the following reasons, the Motion will be granted.

**I.      BACKGROUND**

**A.      Factual Background and Procedural History**

The factual background of this multi-district litigation is more fully set forth in the

Court's August 12, 2011 Memorandum denying Defendants' motions to dismiss the complaint,

*In re Fasteners Antitrust Litig.*, No. 08-1912, 2011 WL 3563989 (E.D. Pa. Aug. 12, 2011), and

the Court's Memorandum granting Plaintiffs' Motion for Final Approval of Proposed

Settlements with the Prym, YKK, and Coats Defendants and Plaintiffs' Proposed Plan for

Distribution of Settlement Funds (ECF No. 134).

Plaintiffs Fishman & Tobin, Greco Apparel, Inc., Jolna Apparel Group LLC, and Norman

Shatz Co., U.S.A. (collectively, "Plaintiffs") brought this consolidated class action on behalf of

themselves and others who purchased fasteners in the United States from Defendants from

January 1, 1991, until September 19, 2007 (the "Class Period").  (*Id.* at ¶ 2.)[1]  Plaintiffs serve as the representatives of the class.  There are three groups of Defendants in this case:  (1) the "Prym Defendants," which include William Prym GmbH & Co. KG, Prym Consumer USA, Inc., Prym Fashion, Inc., Prym Inovan GmbH & Co., Prym Consumer GmbH, EP Group S.A., Inovan GmbH & Co. KG, Prym Fashion GmbH, Prym Consumer Europe GmbH, and William Prym Inc.; (2) the "YKK Defendants," which include YKK Corporation, YKK Corporation of America, Inc., YKK (U.S.A.) Inc., and YKK Snap Fasteners America, Inc.; and (3) the "Coats Defendants," which include Coats Holdings, Ltd., Coats Holdings, Inc., Coats American, Inc., d.b.a. Coats North America, Coats North America de Republica Dominicana, Inc., and Coats & Clark, Inc.[2]

On August 12, 2011, we denied Defendants' joint motion to dismiss.  (ECF Nos. 92-93.) On August 6, 2012, we denied the YKK and Coats Defendants' motion to certify the order denying the motion to dismiss for interlocutory appeal.  (*See* ECF Nos. 118-119.)

On August 12, 2013, Plaintiffs filed a motion seeking preliminary approval of proposed settlements with the Prym, YKK, and Coats Defendants, and seeking authorization to disseminate notice to the settlement class.  (Mot. Prelim. Approval, ECF No. 124.)  Attached as exhibits to Plaintiffs motion for preliminary approval were the proposed settlement agreements with the Prym, YKK, and Coats Defendants.  (Agreements, Mot. Prelim. Approval Exs. 1-3.)

---

[1] The term "Fasteners" includes zippers, snap fasteners, buttons, hooks, and other similar products used primarily in the textile, apparel, footwear, and luggage industries.  (Consol. Class Action Compl. ¶ 35.)

[2] Scovill Fasteners, Inc. was originally a named Defendant in this action.  On April 19, 2011, Scovill filed for Chapter 11 bankruptcy.  (*See* ECF No. 91.)  Subsequently, on July 30, 2013, Plaintiffs voluntarily dismissed the action against Scovill pursuant to Federal Rule 41(a)(1)(A)(i).

On August 26, 2013, we granted Plaintiffs' motion seeking preliminary approval of the proposed settlement.  (Order Prelim. Approval, ECF No. 126.)  In our Order, we determined that the "proposed settlements with Prym, YKK and Coats, as set forth in the respective Settlement Agreements, subject to final determination following proper notice and a fairness hearing, are sufficiently fair, reasonable and adequate to authorize dissemination of notice to the proposed settlement class (the "Settlement Class")."  (*Id*. at ¶ 2.)  We defined the Settlement Class as:

> All persons and entities who purchased Fasteners in the United States directly from a Defendant during the period from and including January 1, 1991 to an including September 19, 2007.  Excluded from the Class are Defendants and their predecessors, successors, parents, subsidiaries, affiliates, divisions and governmental entities.

(*Id*.)  The Preliminary Approval Order also appointed class representatives, appointed Co-Lead Counsel to represent the Settlement Class, approved the form and content of the Notice of Proposed Settlement of Class Action With the Prym, YKK and Coats Defendants and Hearing on Settlement Approval and Claim Form ("Notice"), and directed that the Notice be sent to all members of the settlement class, be posted on the internet, and be advertised in the Wall Street Journal.  (*Id*. at ¶¶ 5-11.)  Finally, the Preliminary Approval Order scheduled a fairness hearing for January 10, 2014, to, among other things, "determine the fairness, reasonableness, and adequacy of the proposed settlements with Prym, YKK and Coats . . . ."  (*Id*. at ¶ 18.)

Pursuant to the Preliminary Approval Order, on October 25, 2013, counsel for the Settlement Class directed a printing company to mail, by first class mail, postage prepaid, 32,359 copies of the Notice to potential Settlement Class members.  Notice of the proposed settlement was also published in the Wall Street Journal on November 7, 2013, and posted on a website, www.FastenersAntitrustLitigation.com.  (Cert. of Mailing, ECF No. 131; *see also* Class Counsel's Report, ECF No. 132.)

The Notice to the Settlement Class advised that any objection to the proposed settlement, to the plan of distribution, or to Plaintiffs' counsel's application for fees, litigation costs, and incentive awards, had to be filed with the Clerk by December 15, 2013.  (Class Counsel's Report 2.)  There were no objections filed by any potential Settlement Class members.  The Notice to the Settlement Class also advised that requests for exclusion from the Settlement Class had to be sent to Settlement Class Counsel no later than December 15, 2013.  (*Id.*)[3]  Settlement Class Counsel received one timely request for exclusion from American Soccer Company, Inc. (d/b/a Score Sports).

On January 24, 2014, we granted Plaintiffs' motion for final approval of the settlement agreements with Defendants.  (*See* ECF No. 134 ("Final Settlement Approval Memorandum"); ECF Nos. 135-137 ("Final Settlement Approval Orders").)  The Settlement Agreements each provide for the resolution of this multi-district litigation.  Pursuant to the proposed settlements, the Prym, YKK, and Coats Defendants will make payments totaling $17.55 million (the "Settlement Fund").  The Prym Defendants will make a payment of $1.1 million, the YKK Defendants will make a payment of $6.6 million, and the Coats Defendants will make a payment of $9.85 million.  (Agreements.)  Each Defendant has already made these required payments into an escrow account that has been accruing interest.

On November 25, 2013, Co-Lead Counsel filed the instant Petition for Award of Counsel Fees, Payment of Costs and Expenses and Award of Incentive Payments to the Class

---

[3] Settlement Class Counsel and Co-Lead Counsel both refer to the four law firms that were appointed by the Court to serve as lead counsel for the Settlement Class.  These firms include:  Barrack, Rodos & Bacine; Kaplan, Fox & Kilsheimer LLP; Kohn, Swift & Graf, P.C.; and Law Offices of Bernard M. Gross, P.C.  (Order Prelim. Approval ¶ 6.)  The instant Petition seeks fees and expenses on behalf of 48 law firms that provided legal services and incurred costs on behalf of Plaintiffs.  Co-Lead Counsel will be responsible for allocating the attorneys' fee award to all of these 48 law firms.

Representatives.  (Pet., ECF No. 129.)  A fairness hearing was held on January 10, 2014.

Arguments were heard regarding the approval of the fees and costs requested in the Petition.

(Jan. 10, 2014 Hr'g Tr. (on file with Court); Min Entry, ECF No. 133.)

## II.   PETITION FOR ATTORNEY'S FEES AND EXPENSES

Co-Lead Counsel requests $5.85 million in attorney's fees, which represents one-third of

the Settlement Fund, and $337,667.72 in litigation costs and expenses.   This is the first time that

Co-Lead Counsel has requested fees and expenses in this case.   No interim fees were requested

or awarded.

Rule 23(h) of the Federal Rules of Civil Procedure provides that "[i]n a certified class

action, the court may award reasonable attorney's fees and nontaxable costs that are authorized

by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  We must determine whether Co-

Lead Counsel's request for these fees and expenses is fair and reasonable.  *Boeing Co. v. Van*

*Gemert*, 444 U.S. 472, 478 (1980) ("[A] litigant or a lawyer who recovers a common fund for the

benefit of persons other than himself or his client is entitled to reasonable attorney's fees from

the fund as a whole."); *Brytus v. Spang & Co*., 203 F.3d 238, 242 (3d Cir. 2000); *In re Corel*

*Corp. Inc*., 293 F. Supp. 2d 484, 498 (E.D. Pa. 2003) ("There is no doubt that an attorney who

has created a common fund for the benefit of the class is entitled to reimbursement of . . .

reasonable litigation expenses from that fund.") (internal quotation omitted).

Generally, two methods are used for assessing attorney's fees:  the percentage-of-

recovery method and the lodestar method.  *In re Prudential Ins. Co. of Am. Sales Practice Litig*.,

148 F.3d 283, 333 (3d Cir. 1998).  In the Third Circuit, "[t]he percentage-of-recovery method is

generally favored in cases involving a common fund, and is designed to allow courts to award

fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'"

*Welch & Forbes, Inc. v. Cendant Corp. (In re Cendant Corp. Prides Litig.)*, 243 F.3d 722, 732
(3d Cir. 2001) (quoting *In re Prudential*, 148 F.3d at 333).  Although the lodestar method is
more commonly used in statutory fee-shifting cases, "it is sensible for a court to use a second
method of fee approval to cross-check its initial fee calculation."  *In re Rite Aid Corp. Sec. Litig*,
396 F.3d 294, 300 (3d Cir. 2005).  In practice, courts in the Third Circuit assess requests for
attorney's fees in antitrust cases using the percentage-of-recovery method, and then cross-check
the result with the lodestar method.  *See, e.g.*, *In re Flonase Antitrust Litig.*, No. 08-3149, 2013
U.S. Dist. LEXIS 83976, at * 17, 27 (E.D. Pa. June 14, 2013); *In re Auto. Refinishing Paint
Antitrust Litig.*, MDL No. 1426, 2008 U.S. Dist. LEXIS 569, at *9 (E.D. Pa. Jan. 3, 2008);
*Craig v. Rite Aid Corp.*, No. 08-2317, 2013 U.S. Dist. LEXIS 2658, at *47-48 (M.D. Pa. Jan. 7,
2013).

### A.  Percentage-of-Recovery Approach

The Third Circuit has identified ten factors for district courts to consider when applying
the percentage-of-recovery method and considering the reasonableness of a request for attorney's
fees:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence
> or absence of substantial objections by members of the class to the settlement
> terms and/or fees requested by counsel, (3) the skill and efficiency of the
> attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of
> nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7)
> the awards in similar cases, (8) the value of the benefits attributable to the efforts
> of class counsel relative to the efforts of other groups, such as government
> agencies conducting investigations, (9) the percentage fee that would have been
> negotiated had the case been subject to a private contingent fee arrangement at the
> time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir. 2009).  The first seven (7) factors
derive from the case *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000), and are
known as the *Gunter* factors.  The remaining three factors come from *Prudential*, 148 F.3d at

6

338-340.  *In re AT&T Corp. Secs. Litig.*, 455 F.3d 160, 165 (3d Cir. 2006).  Many of these

factors overlap with the *Girsh* factors that we discussed in our Final Settlement Approval

Memorandum.  We will consider each *Gunter* and *Prudential* factor; however, we incorporate

the analysis set forth in our Memorandum approving the final settlements.

                    1.        *The size of the fund and the number of beneficiaries*

The settlement negotiations resulted in a settlement fund of $17.55 million.  The number

of settlement class members is unknown at this time.  However, approximately 32,000 Notices of

the proposed settlement were sent to potential settlement class members nationwide.  We are

satisfied that this significant settlement will provide a fair recovery for settlement class members

and direct purchasers of fasteners in the United States.  This factor weighs in favor of approving

the attorney's fees.

                    2.        *Substantial objections by members of the class to the settlement terms or fees requested by counsel*

As of the date of the fairness hearing, not one class member objected to the proposed

settlement or to the amount of fees requested by Co-Lead Counsel.  Only one class member

opted out of the settlement agreements.  We find it significant that, despite the large class size,

there have been no objections.  *See In re Diet Drugs*, 582 F.3d at 541-42 (affirming district

court's approval of fee and noting that district court did not err in placing significant weight to

the fact that there were only a few objections to the settlement and request for attorney's fees).

This factor weighs heavily in favor of approving the fee award.

                    3.        *The skill and efficiency of the attorneys involved*

As explained more fully in our Memorandum approving the settlements, the four law

firms that comprise Co-Lead Counsel in this case are highly qualified, and have extensive

experience and expertise in litigating complex antitrust cases like the instant one.  Moreover,

these attorneys have worked together on other antitrust cases and have had success resolving

disputes.  In addition, we have previously recognized the outstanding efforts of these attorneys in

another antitrust case in this Court.  *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No.

1426, 2004 U.S. Dist. LEXIS 29162, at *21 n.3 (E.D. Pa. Oct. 13, 2004).

 Plaintiffs' Counsel have vigorously litigated this antitrust action over the course of the

past six years.  Among other things, Counsel have drafted the Complaint; interviewed witnesses;

sought, served, received, and reviewed discovery; responded to Defendants' discovery requests;

met with Defendants in order to prepare a joint Rule 26(f) report; interviewed experts regarding

Defendants' liability and damages; prepared motions and briefs in response to Defendants'

attempts to dismiss this action and certify issues for interlocutory appeal.  In addition, Plaintiffs'

Counsel successfully negotiated three settlements with defendants and obtained Court approval

for those settlements.  This Court previously observed that the "very successful settlement

negotiations demonstrate[] the significant skill and expertise of counsel."  *In re Auto. Refinishing

Paint*, 2008 U.S. Dist. LEXIS 569, at *13; *see also In re Warfarin Sodium Antitrust Litig*., 212

F.R.D. 231, 261 (D. Del. 2002) (noting that counsel for the class "showed their effectiveness

through the favorable cash settlement they were able to obtain"); *Cullen v. Whitman Med. Corp*.,

197 F.R.D. 136, 149 (E.D. Pa. 2000) (stating that "[t]he single clearest factor reflecting the

quality of class counsel's services to the class are the results obtained").

 The skill and efficiency of the Plaintiffs' Counsel in this case weighs strongly in favor of

approving the award of attorney's fees.

    *4. The complexity and duration of the litigation*

 Like many other antitrust cases, this case has involved complex issues and has been

lengthy.  The litigation has been ongoing for approximately six years.  Defendants' motions to

dismiss involved complicated legal and factual issues.  Plaintiffs faced three motions to dismiss

from Defendants, which included challenges to their claims on many grounds, including

jurisdiction and sufficiency of the evidence.  The briefing on these motions were extensive and

included multiple complicated legal arguments.  When Defendants' motions to dismiss were

denied by the Court, Plaintiffs were then faced with Defendants' attempt to seek an interlocutory

appeal of the Court's denial.   We agree with Co-Lead Counsel that "[s]ettlement at this juncture

avoids the parties engaging in protracted and expensive discovery on the merits as well as class

certification."  (Pet. 15.)  This factor also weighs in favor of approving the settlement.

> 5.    *The risk of nonpayment*

In our Final Settlement Approval Memorandum, we determined that the risks associated

with establishing liability if litigation were to continue were substantial, and thus weighed in

favor of approving the settlement.  The Third Circuit has found that this risk of establishing

liability is relevant to the analysis of whether there is a risk of nonpayment.  *See In re Rite Aid*,

396 F.3d at 304 (noting that the analysis supporting the risk of liability *Girsh* factor is relevant to

the risk of nonpayment *Gunter* factor).

We understand that Plaintiffs' Counsel undertook this case on a purely contingent fee

basis, and that this poses a significant risk of not being paid or reimbursed for the costs of

litigating the case.  In fact, "any contingency fee includes a risk of nonpayment."  *O'Keefe v.

Mercedes-Benz U.S., LLC*, 214 F.R.D. 266, 309 (E.D. Pa. 2003).  In addition, we realize that Co-

Lead Counsel commenced this litigation without the benefit of information and support provided

by the United States Department of Justice in a parallel investigation.  Co-Lead Counsel state

that they did rely to some degree on the investigation and decision by the European Commission,

which related to the involvement of some Defendants in the operation of European and global

cartels, however, there was no cooperation between Plaintiffs' counsel and the European Commission investigating body in pursuing the claims in the United States.  We agree with Co-Lead Counsel that the risk of not establishing liability and nonpayment are greater when plaintiffs are without the benefit of the results of a corresponding U.S. governmental investigation.  (Petition 15); *see In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at *36 (concluding that petitioners faced significant risk of nonpayment and finding relevant to this conclusion the fact that "petitioners did not benefit from the fruits of a prior government investigation or prosecution").  This factor weighs in favor of approving the fee award.

> 6.      *The amount to time devoted to the case by Plaintiffs' counsel*

Attached as an exhibit to Co-Lead Counsel's Petition is the Declaration of Warren Rubin, Esq., which is offered in support of the requested fees and expenses.  (Rubin Decl., Pet. Ex. 1.) Attached to the Rubin Declaration are additional declarations from the other three law firms representing the class representatives, and a spreadsheet detailing the costs and fees incurred by all 48 law firms that represented Plaintiffs.  These exhibits demonstrate that, in the aggregate, Co-Lead Counsel have expended approximately 11,753 hours litigating this case since its inception in early 2007.  (Rubin Decl. & Ex. A & B.)  The amount of hours spent by all Plaintiffs' counsel represents an aggregate lodestar of $8,540,668.80.  (Pet. 16 & Rubin Decl Ex. B.)  In addition, Plaintiffs' counsel have incurred $377,667.72 in expenses.  (*Id.*)  The amount of time spent and costs incurred by Co-Lead Counsel "demonstrate a significant commitment of resources to this litigation."

> 7.      *The awards in similar cases*

Co-Lead Counsel's request for one third of the settlement fund is consistent with other direct purchaser antitrust actions.  *See In re Flonase*, 2013 U.S. Dist. LEXIS 83976, at *22-23

(citing cases approving of one third fees in direct purchaser antitrust actions).  The amount is also consistent with attorney's fees awards generally granted in this Circuit.  *See Steele v. Welch*, No. 03-6596, 2005 U.S. Dist. LEXIS 16577, at *5-6 (E.D. Pa. May 20, 2005) (finding a fee of 33%, plus expenses, to be reasonable); *In re Corel Corp.*, 293 F. Supp. 2d 484, 497-98 (awarding counsel one-third of the settlement fund in addition to the reimbursement of litigation expenses); *In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 433-34 (E.D. Pa. 2001) (approving a fee request of one-third of the settlement fund plus nearly $ 1,800,000 in expenses).  We also find it significant that the Notice of the proposed settlement advised class members that counsel would be seeking one third of the settlement fund as attorney's fees and not one class member objected.  *See In re Flonase*, 2013 U.S. Dist. LEXIS 83976, at *23-24.  This factor weighs in favor of approving the requested fee award.

> 8.   *The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups*

As noted above, Co-Lead Counsel commenced this litigation without the benefit of information and support provided by the United States Department of Justice in a parallel investigation.  Co-Lead Counsel state that they did rely to information uncovered during the European Commission investigation, but the investigating body in the European Commission provided no support to Plaintiffs' counsel in pursuing the claims in the United States.

The fact that Co-Lead Counsel were not assisted by a United States governmental investigation weighs in favor of approving the fee award.  *See In re AT&T Corp. Secs. Litig.*, 455 F.3d 160, 173 (3d Cir. 2006) (affirming district court's approval of fee award in antitrust litigation and finding significant that "class counsel in this case was not aided by a government investigation"); *In re Prudential*, 148 F.3d at 338.

> 9.   *The percentage fee that would have been negotiated had the case been subject to private contingent fee arrangement*

This factor considers "the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained." *In re Diet Drugs*, 582 F.3d at 541.  Co-Class Counsel assert that counsel typically negotiate for contingency fees between 30% and 40%, and therefore, it is reasonable to assume that the one-third attorney fee award requested here would have been negotiated had the case been subject to a private contingent fee arrangement.  This argument is somewhat speculative.  However, we agree that a one-third contingency fee arrangement is not out of the ordinary in a complex case like this one.  Even though we find that this factor weighs in favor of approving the one-third fee award, we do not assign it great weight given the uncertainty underlying our predicting how the parties would have negotiated at the outset of litigation.  *See In re Flonase*, 2013 U.S. Dist. LEXIS 83976, at *25-26.

> 10.   *Any innovative terms of settlement*

Co-Lead Counsel assert that the three settlement agreements contain relatively standard settlement terms.  Accordingly, this factor is neutral, neither weighing in favor of or against approval of the proposed fee award.

**B.     The Lodestar Cross-Check**

As stated above, the lodestar method is used to cross-check the reasonableness of the award as determined using the percentage of recovery method.  *In re AT&T Corp.*, 455 F.3d at 164.  Calculating the lodestar is accomplished by "dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier."  *Id*.  The purpose of the multiplier is "to account for the contingent nature or risk involved in a particular case."  *Id*. at 164 n.4.  Moreover, the multiplier may be adjusted "to account for particular circumstances, such as the

quality of the representation, the benefit obtained for the class, [and] the complexity and novelty of the issues presented." *Id.* The lodestar cross-check, while useful, should not displace a district court's primary reliance on the percentage-of-recovery method." *Id.* at 164.

Here, the lodestar represents a negative multiplier of 0.68. This is calculated by dividing the proposed fee award of $5.85 million by the aggregate lodestar value of all of Co-Lead Counsel's time litigating this matter, $8,540,668.80. A negative multiplier results when the aggregate lodestar value, or the amount of money spent by all the attorneys, is greater than the actual award of fees requested. Courts in this Circuit have found multipliers up to four as reasonable in light of the risks of litigation. *See, e.g.*, *Meijer Inc. v. 3M*, No. 04-5871, 2006 U.S. Dist. LEXIS 56744, at *82 (E.D. Pa. Aug. 14, 2006) (noting multiplier of 4.77); *In re Flonase Antitrust Litig.*, 2013 U.S. Dist. LEXIS 83976, at *30 (noting lodestar multiplier of 2.99). Since the multiplier here is less than one, which means that the requested fee is less than the amount that would be awarded using the lodestar method, we are satisfied that a lodestar cross-check confirms the reasonableness of Co-Lead Counsel's request for attorney's fees. *See In re Auto. Refinishing Paint Antitrust Litig.*, 2008 U.S. Dist. LEXIS 569, at *12 (observing that fee awards based on negative multipliers are indicative of the reasonableness of the award).

### C.     The Amount of Requested Litigation Expenses is Reasonable

Co-Lead Counsel also seek reimbursement of $337,667.72 in litigation costs and expenses incurred in the prosecution of this action. We have observed that "there is no reason to reject the request for reimbursement of [expenses] that counsel have spent out of their own pockets in litigating [an antitrust] case." *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *35-36 (E.D. Pa. Oct. 13, 2004). Moreover, "attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable

litigation expenses from the fund." *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at *40 (E.D. Pa. Jan. 4, 2001).  Finally, we emphasize that no class member has objected to the request for attorney's fees or to the request for reimbursement of expenses. Accordingly, Co-Lead Counsel's request for reimbursement of litigation costs and expenses will be granted.

## IV.    PETITION FOR INCENTIVE AWARDS FOR CLASS REPRESENTATIVES

Finally, Co-Lead Counsel requests that the four Class Representatives—Fishman & Tobin, Inc., Greco Apparel, Inc., Jolna Apparel Group, LLC, and Norman Shatz Co, U.S.A.—be provided incentive awards in the amount of $5,000 each.   "Incentive awards are not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class."  *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir 2011) (citations omitted).

"The purpose of [incentive awards] is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation."  *Id.*; *see also In re Auto. Refinishing Paint Antitrust Litig.*, 2008 U.S. Dist. LEXIS 569, at *21 ("Incentive awards are typically awarded to class representatives for their often extensive involvement with a lawsuit and courts in [the Third Circuit] have traditionally granted requests for these awards."); *In re Plastic Tableware Antitrust Litig.*, No. 94-3564, 1995 U.S. Dist. LEXIS 18166, at *5-6 (E.D. Pa. Dec. 4, 1995) ("Payments to class representatives may be considered a form of restitutionary relief within the discretion of the trial court.  They may also be treated as a reward for public service and for the conferring of a benefit on the entire class.").   In this case, the class representatives not only provided a benefit to the class as a whole, but also risked their existing relationships with the suppliers of fasteners.  *See In re Auto. Refinishing Paint*, 2008 U.S. Dist.

LEXIS 569, at *22; *Cullen*, 197 F.R.D. 136, 145 ("[C]ourts routinely approve incentive awards to compensation named plaintiffs for the services [class representatives] provided and the risks they incurred during the course of the class action litigation.").

Co-Lead Counsel assert that the class representatives provided information to counsel about the fastener industry, searched for and produced documents to counsel and were in communication with counsel with respect to all of the filings in this litigation.  Moreover, counsel point out that there are attendant risks in their industry that the class representatives undertook with respect to their existing relationships with the suppliers.  *See In re Flonase Litig.*, 2013 U.S. Dist. LEXIS 83976, at *32 (noting that the class representatives "launched this litigation despite the risk of retaliation inherent in suing a supplier").  Under the circumstances, we are satisfied that an award of $5,000 to each class representative is perfectly reasonable in light of the duration and complexity of this litigation.  Accordingly, Co-Lead Counsel's request for incentive awards for the class representatives will be granted.

## V.      CONCLUSION

For all of the reasons stated above, Co-Lead Counsel's Joint Petition for Award of Counsel Fees, Payment of Costs and Expenses and Award of Incentive Payments to the Class Representatives will be granted.

An appropriate Order follows.

**BY THE COURT:**

_____
**R. BARCLAY SURRICK, J.**